UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TAMARA EVANS,<br><br>            Plaintiff,<br><br>    v.<br><br>CALIFORNIA COMMISSION ON<br>PEACE OFFICERS STANDARDS AND<br>TRAINING, et al.,<br><br>            Defendants. | No. 2:15-cv-01951-DJC-SCR<br><br><br>**<u>ORDER</u>** |

        This case previously proceeded to jury trial on Plaintiff Tamara Evans' claims

against the California Commission on Peace Officers Standards and Training ("POST").

At the conclusion of trial, the Jury entered a verdict for Plaintiff, finding Defendant

liable for retaliation against Plaintiff for acting as a whistleblower in violation of

California Government Code section 8547.8.  Defendant has now filed a Renewed

Motion for Judgment as a Matter of Law under Federal Rule of Civil Procedure 50(b)

and a Motion for New Trial under Federal Rules of Civil Procedure 59 and 60.  Also

pending is Plaintiff's Bill of Costs for which Defendant has filed objections.

        For the reasons stated below, the Court denies Defendant's Motion under Rule

50(b), denies in part and conditionally denies in part Defendant's Motion under Rule

////

1  59, denies Defendant's Motion under Rule 60, and sustains in part and overrules in

2  part the objections to Plaintiff's Bill of Costs.

3  **BACKGROUND**

4      The full facts and history of this case are well known to the Court and parties.

5  Trial on this matter began on September 3, 2024, and the presentation of evidence

6  concluded on September 24, 2024.  (ECF Nos. 184, 212.)  At the close of Plaintiff's

7  case-in-chief, Defendant moved for a directed verdict under Rule 50(a).  (ECF No.

8  202.)  At that time, the Court deferred a ruling on that motion.  (*Id.*)  At the close of

9  Defendant's case-in-chief, Defendant again moved for a directed verdict under Rule

10  50 which the Court denied.  (ECF No. 212.)  Though Plaintiff originally proceeded to

11  trial on multiple claims, at the close of evidence, Plaintiff dismissed all but her claim

12  under Government Code section 8547.8.  Jury deliberations began on September 25,

13  2024, and the jury returned a verdict in favor of Plaintiff the following day.  (ECF No.

14  219.)

15      Briefing has been completed on Defendant's Motion for New Trial under

16  Federal Rule of Civil Procedure 59 (New Trial Mot. (ECF No. 249-1); New Trial Opp'n

17  (ECF No. 251); New Trial Reply (ECF No. 260)) and a Renewed Motion for Judgment

18  as a Matter of Law under Federal Rule of Civil Procedure 50(b) (JMOL Mot. (ECF No.

19  248-1); JMOL Opp'n (ECF No. 252); JMOL Reply (ECF No. 259)).  The matter was

20  taken under submission pursuant to Local Rule 230(g).

21  **RULE 50(b) MOTION**

22  **I.    Legal Standard**

23      The standard to grant a motion for judgment as a matter of law under Rule

24  50(b) is "very high."  *Costa v. Desert Palace, Inc.*, 299 F.3d 838, 859 (9th Cir. 2002).  To

25  overturn a jury's verdict by granting such a motion request there be "no legally

26  sufficient basis for a reasonable jury to find for that party on that issue."  *Id.* (internal

27  citations and quotations omitted) (quoting *Reeves v. Sanderson Plumbing Prods.*, 530

28  U.S. 133, 149 (2000)).  The Court may not substitute its view of the evidence for the

1     jury's, make credibility determinations, or weigh the evidence and must draw all

2     inferences in favor of the non-moving party. *Id.*; *Josephs v. Pac. Bell*, 443 F.3d 1050,

3     1062 (9th Cir. 2006). Evidence for the moving party that the jury need not believe

4     should be disregarded. *Costa*, 299 F.3d at 859 (quoting *Reeves*, 530 U.S. at 151).

5     "The test applied is whether the evidence permits only one reasonable conclusion,

6     and that conclusion is contrary to the jury's verdict." *EEOC v. Go Daddy Software, Inc.*,

7     581 F.3d 951, 961 (9th Cir. 2009).

8          A renewed motion under Rule 50(b) must be preceded by a Rule 50(a) motion

9     made before the case was submitted to the jury. *Id.* "If the judge denies or defers

10    ruling on the [Rule 50(a)] motion, and if the jury then returns a verdict against the

11    moving party, the party may renew its motion under Rule 50(b)." *Id.* As a renewed

12    motion, the grounds for judgment made in a Rule 50(b) motion are "limited to the

13    grounds asserted in the pre-deliberation Rule 50(a) motion." *Id.*

14    **II.**     **Discussion**

15          At the close of evidence, the Jury was instructed that in order to find Defendant

16    liable, they needed to find by a preponderance of the evidence that (1) Plaintiff

17    reported waste, fraud, violation of law or abuse of authority; (2) that her

18    communication disclosed evidence of improper governmental activity; (3) that she

19    made the communication in good faith; (4) that Defendant took adverse action against

20    Plaintiff; (5) that Plaintiff's communication was a contributing factor in Defendant's

21    decision to take adverse employment action against Plaintiff; (6) that Plaintiff was

22    harmed; and (7) that Defendant's conduct was a substantial factor in causing Plaintiff's

23    harm. (Jury Instructions (ECF No. 213).) Defendant argues in their Rule 50(b) motion

24    that the evidence presented was insufficient for the Jury to find that Plaintiff had met

25    elements two and five by a preponderance of the evidence. (JMOL Mot. at 3–7.)

26    Defendant also contends that they proved by clear and convincing evidence that

27    Plaintiff would have been terminated at that time anyway for legitimate reasons. (*Id.* at

28    8–10.) The Court takes each of these arguments in turn.

### A. Protected Disclosure

Defendant first challenges the sufficiency of the evidence supporting the Jury's finding that Plaintiff's protected disclosure was a contributing factor in Defendant's decision to take adverse action against Plaintiff.  In order to find Defendant liable, the Jury was required to find that Plaintiff made a communication that disclosed improper government activity.  (Jury Instructions at 16.)  Defendant contends that Plaintiff failed to establish that her communications disclosed information of improper governmental activity as her communications concerned San Diego Regional Training Center ("SDRTC"), a third party who was not a state agency, and not activity taken by Defendant.

At trial, Plaintiff presented evidence that she had raised concerns regarding Defendant's approval and payment of invoices from SDRTC, despite SDRTC's insufficient documentation and budget-based billing.  While SDRTC is not a state agency, the evidence presented did not solely concern activity by SDRTC.  Testimony at trial supported that Plaintiff had reported that she believed that Defendant was violating the law by approving and paying SDRTC's invoices despite the invoices being improper and insufficiently supported by documentation.  Plaintiff and D'Karla Davis both testified that Plaintiff had raised concerns not just about SDRTC's practices but also about Defendant's approval of SDRTC's invoices.  For example, Davis testified that she heard POST Bureau Chief Edmund Pecinovsky ask Plaintiff why she was questioning Defendant's practices.  (9/6/24 Tr. (ECF No. 227) at 490:23–25.)  Plaintiff herself testified that at one point she declined to pay SDRTC's invoices because she believed doing so would be a violation of federal law but that she had been ordered to pay them anyway:

> Q: And so when you brought these various concerns to the attention of Mr. Pecinovsky, how did he react?
>
> A: He was unhappy. He told me that I should just let it go.

Q: Then what did you say back to him?

A: I said that I can't do that, it's federal grant money.

Q: And when you said that to him, what were you thinking in terms of whether or not it would comply with federal law to pay these invoices in this condition?

A: I didn't think that would be allowed under federal law.

(9/11/24 Tr. (ECF No. 230) at 1244:24–1245:7.)

The evidence presented at trial supports a reasonable jury finding that Plaintiff's communications concerned both the inadequacy of SDRTC's billing <u>and</u> Defendant's payment of invoices from SDRTC using VAWA grant funds despite Defendant's awareness of the alleged incompleteness of SDRTC's supporting documentation and their improper billing practices.  This evidence would support a finding that Plaintiff acted in good faith with the intention of disclosing information that may have evidenced improper government activity by Defendant.  While it may be that Defendant's payment of those invoices did not violate state or federal law[1], it is not necessary that the Jury or Court later determine that Defendant had engaged in illegal acts for the elements of a violation of section 8547.2(c)(1) to be satisfied.  It is sufficient that Plaintiff was disclosing or attempting to disclose what <u>may</u> have constituted improper governmental activity.  *See Evans v. POST*, 2:15-cv-01951-MCE-DB, 2023 WL 8091823, at *8 (E.D. Cal. Nov. 21, 2023); *see also* Gov't Code § 8547.2(e) ("'Protected disclosure' means a good faith communication, including a communication based on, or when carrying out, job duties, that <u>discloses or demonstrates an intention to disclose</u> information that <u>may</u> evidence . . . improper governmental activity . . . ." (emphasis added)).  Moreover, improper governmental

---

[1] Senior District Judge Morrison C. England previously partially addressed this question in the prior action in *United States v. SDRTC*, No. 2:15-cv-00619-MCE-CKD, 2022 WL 891275 (E.D. Cal. Mar. 25, 2022).  The Court here takes no position on the meaning or effect of that order but mentions it only to highlight that this issue has been addressed in separate actions.

1  activity within the meaning of section 8547 is not limited to activities that violate laws

2  or regulations, but also includes actions that are "economically wasteful, involves

3  gross misconduct, incompetency, or inefficiency."  Gov't Code section 8547.2(c)(1)(C).

4  Thus, to satisfy the second element, the Jury needed only to conclude that Plaintiff

5  had disclosed or intended to disclose information that may have evidenced any

6  improper government activity, not just illegal acts.

7          Given the above, the evidence presented was sufficient for a reasonable jury to

8  find that Plaintiff had proven by a preponderance of the evidence that Defendant had

9  Plaintiff's communication disclosed or demonstrated an intent to disclose information

10  that may have evidenced illegal government activity.  Defendant's Rule 50(b) Motion

11  on this ground is denied.

12          **B.  Contributing Factor**

13          There was also sufficient evidence for the Jury to find that Plaintiff's

14  communication was a contributing factor in the adverse employment action Plaintiff

15  suffered.  California defines an adverse employment action as one that "materially

16  affect[s] the terms, conditions, or privileges of employment."  *Flores v. City of*

17  *Westminster*, 873 F.3d 739, 748 (9th Cir. 2017) (internal citations and quotation marks

18  omitted).  "[T]he phrase 'terms, conditions, or privileges' of employment must be

19  interpreted liberally and with a reasonable appreciation of the realities of the

20  workplace in order to afford employees the appropriate and generous protection

21  against employment discrimination that the FEHA was intended to provide."  *Id.*

22          At trial, Plaintiff presented substantial evidence from which the Jury could

23  reasonably conclude Defendant had taken adverse employment action against

24  Plaintiff for her communication.  Trial evidence showed that shortly following the

25  monitoring visit with auditors from the California Emergency Management Agency

26  ("CalEMA") in 2010, Plaintiff was removed from her role as Program Manager over the

27  VAWA grant.  (9/11/24 Tr. at 1286:3–11; 9/6/24 Tr. at 530:19–22.)  In doing so, Plaintiff

28  was excluded from further interaction with the CalEMA auditors.  (9/24/24 Tr. (ECF No.

6

1    255-4) at 59:15–20.)  There was also evidence presented from which a jury could

2    conclude that in response to the negative audit finding Plaintiff was even blamed by

3    POST for the SDRTC VAWA grant issues.  (9/17/24 Tr. (ECF No. 255-1) at 131:14–

4    133:1; Trial Ex. 268 (Bohm Decl. re:JMOL (ECF No. 252-1), Ex. 3) at 7.)  Plaintiff also

5    presented the jury with evidence that Plaintiff had received a performance evaluation

6    in 2011 (for the prior year) from Mr. Pecinovsky that contained negative remarks which

7    Plaintiff had contemporaneously complained were the result of her communication

8    concerning the VAWA grant funds.  (Trial Exhibit 115 (Bohm Decl. re:JMOL, Ex. 6) at

9    1.)  Plaintiff further presented witness testimony that in 2012, she was passed over for

10   a promotion to bureau chief, (9/11/24 Tr. at 1360:2–1362:7,) and later had her prior

11   approval to attend command college revoked by the new bureau chief (9/18/24 Tr.

12   (ECF No. 255-2) at 59:8–60:4).  Plaintiff claimed that Anne Brewer also took away

13   access to support staff that Plaintiff had previously utilized.  (9/11/24 Tr. at 1366:3–19.)

14   There was also testimony that following the CalEMA monitoring visit, Mr. Pecinovsky

15   began keeping a log of Plaintiff's emails.  (*Id.* at 1312:1–14; Trial Ex. 89 (Bohm Decl.

16   re:JMOL, Ex. 9) at 1.)  In 2013, Plaintiff was subject to an investigation by Ms. Brewer

17   and eventually terminated from her position at POST.  (*See* Trial Ex. A (Bohm Decl.

18   re:JMOL, Ex. 1).)

19          As an initial point, Defendant proceeds from the assumption that the adverse

20   action was Plaintiff's termination.  Instead, the evidence presented would permit the

21   Jury to find an adverse employment action beyond just the termination.  Even if some

22   of these individual incidents do not rise to the level of an adverse employment action

23   (though some also may on their own), "alleged acts of retaliation may be considered

24   collectively to determine whether, taken together, they constitute an adverse

25   employment action under the statute."  *Flores*, 873 F.3d at 749 (internal citations and

26   quotation marks omitted) (emphasis added).  With this evidence, the Jury could more

27   than reasonably conclude that these events, as a whole, amounted to adverse

28   employment action.

1    More directly to the arguments raised in Defendant's Motion, the Jury could
2    also conclude that a contributing factor to that adverse employment action was
3    Plaintiff's protected disclosure.  Plaintiff presented evidence that prior to her
4    communication she had worked successfully at POST without incident.  Following the
5    disclosure, Plaintiff suffered the string of incidents described above.  Many of these
6    events have some direct connection to the CalEMA audit (e.g. her exclusion from
7    further communication with CalEMA auditors and the apparent suggestion that
8    Plaintiff was responsible for the negative finding) and those that are not directly
9    connected could still be found connected by a reasonable jury based on the series of
10   negative events Plaintiff endured following the disclosure.  Thus, a reasonable jury
11   could conclude that Plaintiff's protected disclosure was a contributing factor to the
12   adverse employment action(s) against Plaintiff.  Defendant raises several specific
13   arguments as to why Plaintiff failed to establish the contributing factor requirement.
14   The Court addresses these issues in turn.

### 1.  Time Between Disclosure and Termination

16   Defendant complains that it was unreasonable for the jury to find a connection
17   between the disclosure and her termination due to the over two-and-a-half-year gap
18   between the two events is also unavailing.  As discussed, the evidence presented was
19   sufficient for the jury to find that Defendant took adverse employment action against
20   Plaintiff based either on individual acts or a collection of those actions.  However, even
21   if the jury found that Plaintiff's ultimate termination was the adverse action, the many
22   intervening incidents of which Plaintiff introduced evidence provided a connective
23   tissue of events from which the Jury could reasonably conclude that Plaintiff's
24   protected disclosure was a contributing factor to her termination.  The Court also
25   properly instructed the Jury that they did not need to find that the disclosure was the
26   sole basis for the adverse action but a <u>contributing</u> factor, meaning a factor that alone
27   or in connection with other factors tends to affect the outcome of a decision.  Based
28   on the evidence Plaintiff introduced at trial, the Jury could reasonably determine that

1   Plaintiff's protected disclosure was a contributing factor in Defendant's decision to

2   take adverse employment actions against Plaintiff even with the length of time

3   between the disclosure and Plaintiff's termination.

### 2. Gap in Major Adverse Events

5           Defendant argues that because there is a gap in time between early 2011 and

6   late 2012 when Plaintiff had no "issues" at work, the Jury could not reasonably find

7   that Plaintiff's termination in 2013 was the result of her disclosure to CalEMA in 2013.

8   Again, the Court notes that Plaintiff's termination was not the only adverse

9   employment action the Jury could reasonably conclude Plaintiff suffered.  It is also not

10  clear that Plaintiff's employment during this period was free of any negative incidents

11  that suggested there remained ill will towards her for her protected disclosure.  For

12  example, Mr. Gomez testified that after he was promoted to be Plaintiff's supervisor as

13  Bureau Chief (an event that occurred in late 2011), he interacted with Plaintiff's former

14  supervisor, Mr. Pecinovsky, who told him to "[w]atch out for her," in reference to the

15  Plaintiff.  (9/4/24 Tr. (ECF No. 226) at 264:22–265:12.)  This comment was later also

16  passed along to Plaintiff by Mr. Gomez.  (Id. at 265:13–24.)

17          Moreover, even if the adverse employment action was Plaintiff's termination,

18  the fact that major incidents did not occur during the period Defendant identifies

19  does not make the Jury's determination that the disclosure was a contributing factor in

20  the adverse employment action unreasonable.  Notably, this period was when Plaintiff

21  was supervised by Mr. Gomez with whom Plaintiff apparently had a good relationship.

22  From the testimony at trial, the Jury could reasonably conclude that Mr. Gomez's

23  presence insulated Plaintiff from negative work experiences in response to her

24  communication but that the negative sentiments toward Plaintiff remained.  This was

25  supported by the evidence presented at trial that Plaintiff was not selected to replace

26  Mr. Gomez when he retired and, when Ms. Brewer took the Bureau Chief position,

27  Plaintiff was quickly subject to several of the alleged negative events described

28  previously.  Defendant's claim that "there was no evidence that POST was taking, or

1  would have taken, any adverse action against Plaintiff" until the Enterprise incident in

2  2012 is also inaccurate for the same reasons and because evidence showed that

3  Plaintiff had seemingly been blamed for the negative audit finding before that point

4  (Trial Ex. 268 at 7) and Plaintiff her command college approval had been revoked

5  (9/11/24 Tr. at 1362:15–1363:17).

6      For these reasons, Defendant's argument that Plaintiff failed to establish the

7  contributing factor element based on a purported gap in "issues at work" between

8  2011 and 2012 is unavailing.  Based on this, the Jury could reasonably find that

9  Plaintiff's communication was a contributing factor in the adverse employment actions

10  taken against her.

11      **3.  Final Decisionmaker's Knowledge of Plaintiff's Communication**

12      Defendant argues that the evidence at trial did not establish that Richard Reed,

13  who signed the Notice of Adverse Action terminating Plaintiff, had any knowledge of

14  Plaintiff's communication of improper governmental activity.  As an initial matter,

15  testimony at trial supported a finding that Robert Stresak was responsible for the

16  decisions to place Plaintiff on administrative leave and to terminate her employment.

17  (9/4/24 Tr. at 399:21–400:1.)  Based on this evidence, the Jury could reasonably find

18  that Mr. Stresak was responsible for the ultimate determination of whether to

19  terminate Plaintiff's employment.[2]  The Court again reiterates that the evidence at trial

20  was sufficient for the jury to reasonably find that the adverse action Plaintiff suffered

21  was a cumulative set of actions performed by individuals with knowledge of Plaintiff's

22  communication.  As such, it is not clear that it is at all relevant whether her ultimate

23  termination was expressly based on that communication or was simply the cumulative

24  result of Plaintiff's adverse treatment due to her communication.

25

26  [2] While Mr. Reed is the signatory on the Notice of Adverse Action, Defendant has not established that
this means that Mr. Reed was responsible for Plaintiff's termination as a matter of law.  At trial, Mr.
Stresak clearly testified that Plaintiff's termination was ultimately his decision.  (9/4/24 Tr. at 399:21–

27  400:1.)  In light of this testimony, this was a disputed factual issue, and the Jury could reasonably
conclude that Mr. Stresak was the individual with the authority to terminate Plaintiff and who made the

28  ultimate decision to do so.

1    Moreover, even if the adverse employment action were Plaintiff's final

2    termination, the evidence presented was sufficient for the Jury to find that her

3    termination was motivated, at least in part, by Plaintiff's communication.  The

4    testimony presented to the Jury made clear that Mr. Stresak was not involved in

5    investigating the incidents covered by the Notice of Adverse Action.  (9/9/24 Tr. (ECF

6    No. 228) at 706:17–24.)  Mr. Stresak testified that he relied on the report and did not

7    even review the video of the Enterprise incident because, in his words, "I trusted my

8    staff to do a thorough job, including the review of the video." (*id.* at 708:24–709:10.)

9    Similarly, while Mr. Reed testified that he initiated the investigation (9/24/24 Tr. at

10    129:5-9) and was the point of contact for Ms. Brewer in the executive office (*id.* at

11    131:5-19), Mr. Reed was also not involved in the actual investigation process and only

12    provided guidance from afar (*id.* at 129:15–130:9, 144:23–145:2).  Instead, the

13    termination was made based on the investigation report produced by Ms. Brewer.  (*Id.*

14    at 133:9-10 ("I think the report that she came forward with told me what I already

15    needed to know."), 144:19–22.)

16    As such, it would be reasonable for the jury to conclude that any decisions

17    made by Mr. Reed and Mr. Stresak were based on and infected by Ms. Brewer's

18    position against Plaintiff.  Though the investigation report does not contain

19    information about Plaintiff's disclosures to the CalEMA auditors, it notably contains a

20    summarized discussion of Plaintiff's history concerning the VAWA grant program and

21    SDRTC, including Plaintiff's removal as Program Manager, based on an interview of

22    Mr. Pecinovsky conducted by Ms. Brewer.  (Tr Ex. A at 14–15.)  Thus, based on the

23    testimony and evidence presented at trial, a reasonable jury could conclude that Ms.

24    Brewer was aware of Plaintiff's disclosures to the CalEMA auditors and that Ms. Brewer

25    created a highly negative investigation report against Plaintiff in part because of those

26    disclosures.  This is supported by Mr. Stresak's testimony that multiple pieces of

27    information that should have been included in the report were omitted and that there

28    ////

1    were errors in conducting the investigation. (*See, e.g.,* 9/9/24 Tr. at 713:3–10; 740:17–
2    23.)

3         Given Mr. Stresak's heavy reliance on Ms. Brewer's investigation and report, the
4    Jury could reasonably find that whether Mr. Stresak was aware of Plaintiff's
5    communication was ultimately unimportant as Mr. Stresak had effectively adopted in
6    full Ms. Brewer's justification for adverse employment action any further investigation.[3]
7    On this basis, the Jury could find that the motivation underlying the investigative
8    report, and thus Mr. Stresak's determination, was at least partially to retaliate against
9    Plaintiff and impose an adverse employment action at least in part based on her
10   protected disclosure.

11        The Jury's decision to find that Plaintiff's protected disclosure was a
12   contributing factor in the adverse employment actions against Plaintiff is thus not
13   contrary to the evidence presented at trial.  Accordingly, Defendant's Motion on this
14   ground is denied.

15   **C. Legitimate Reasons**

16        Finally, a reasonable jury could find that Defendant had not proven by clear and
17   convincing evidence that Defendant would have taken adverse action against Plaintiff
18   anyway for legitimate reasons.  Notably, the question for judgment as a matter of law
19   is not whether, in the Court's view, the evidence was clear and convincing that
20   Defendant had separate, legitimate reasons for terminating Plaintiff, but whether no
21   reasonable jury could have found that Defendant had not met their burden.  While
22   Defendant did present evidence at trial about the alternate, legitimate bases for
23   Plaintiff's termination, the weight of that evidence was not such that a reasonable jury
24   could only find that Defendant had met their burden.  Thus, Defendant's Motion on
25   this basis is also denied.

26

27   [3] The Jury could also simply choose to disbelieve Mr. Stresak's testimony that he was unaware of the
     CalEMA monitoring incident and Plaintiff's disclosure to the auditors given the testimony presented as
28   to the significance of a negative audit finding by CalEMA.

**RULE 59 MOTION**

### I.      Legal Standard

Rule 59(a) partially provides that after a jury trial, a court may grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court[.]" *See also Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1035 (9th Cir. 2003) (internal citations and quotations removed). "Historically recognized grounds include, but are not limited to, claims that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving." *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007).

### II.      Discussion

Defendant's Rule 59 New Trial Motion first raises similar issues addressed above, arguing that the verdict is against the clear weight of the evidence. For the same reasons stated above, Defendant's Rule 59 Motion on these grounds is denied. Defendant's other main bases for a new trial are the Court's evidentiary rulings at trial and that the damages awarded by the jury are excessive. Defendant also asks that the Court "correct the verdict form and clarify the total award" based on an alleged inconsistency in the verdict form.

#### A. Evidentiary Rulings

Defendant contends that the Court erred in denying Defendant's request for the Court to conclusively determine certain purported findings of the qui tam action, permitting Plaintiff to elicit testimony that contradicted the ruling in the qui tam action by suggesting SDRTC engaged in fraudulent practices, and improperly permitted evidence related to the CalEMA audit and the resultant adverse finding. At the core of these arguments is Judge England's ruling in the qui tam action. While the resolution of the qui tam action was undoubtedly relevant to this action, it addressed notably different issues from those presented in this action. *See SDRTC*, 2:15-cv-00616-MCE-CKD, 2022 WL 891275 (E.D. Cal. Mar. 25, 2022). The qui tam action found that

1    neither SDRTC nor POST had actually engaged in fraudulent activity.  But as Judge

2    England observed in a prior order and this Court discussed above, the question in this

3    action was distinct.  (*See* ECF No. 129; *see supra* Rule 50(b) Motion II.A.)

4         The Jury here was asked to determine whether Defendant retaliated against

5    Plaintiff for making a protected disclosure within the meaning of Government Code

6    section 8547.2(e).  *See* Cal. Gov't Code section 8547.8.  Under section 8547.2(e), a

7    protected disclosure is defined as ". . . a good faith communication, including a

8    communication based on, or when carrying out, job duties, that discloses or

9    demonstrates an intention to disclose information that may evidence . . . an improper

10   governmental activity . . . ."  Notably absent from that section is any requirement that

11   the communication result in an ultimate determination that improper governmental

12   activity or fraud of any sort actually occurred.  It is only required that the information,

13   disclosed in good faith, <u>may</u> evidence improper government activity.  In discussing

14   the e14ffects of the ruling in the qui tam action on the present case at Summary

15   Judgment, Judge England noted this distinction and specifically permitted that

16   "Plaintiff [could] proceed on her remaining retaliation claims only on the theory that

17   she <u>believed</u> in good faith that RTC's conduct was unlawful."  (ECF No. 129 at 17

18   (emphasis in original).)  As Judge England noted, the later legal determination that

19   Defendant had not engaged in fraudulent activity is not relevant to whether Plaintiff

20   had made a protected disclosure.  (*Id.* ("At base Plaintiff's <u>perception</u> of RTC's actions

21   is relevant; this Court's legal conclusions as to the propriety of those actions is not."

22   (emphasis in original).)

23        As a result, each of the arguments raised in Defendant's Rule 59 Motion on this

24   basis are unpersuasive.  Defendant complains that the Court erred in denying

25   Defendant's second Motion in Limine requesting the Court preclude Plaintiff from

26   relitigating issues previously determined by the Court in the qui tam action.  (New

27   Trial Mot. at 5-6.)  The Court did deny this Motion in Limine but only on the basis that

28   Plaintiff's perception of whether practices might be fraudulent was the relevant issue

in this action and it was not possible for the Court to determine before trial whether specific testimony crossed into the realm of re-litigating the qui tam action. The Court still specifically stated that it would be impermissible to relitigate the qui tam action and that Plaintiff could not make statements that POST or RTC, in fact, made false claims. In noting that the Court would need to hear the testimony at trial, the Court left the door fully open to further litigation of this issue where testimony strayed towards re-litigating these issues in the context of specific testimony at trial.

Defendant also argues that the Court overruled later objections and permitted Plaintiff's witnesses to testify in a manner that contradicted the findings of the qui tam action. (New Trial Mot. at 6.) Defendant provides no citation for this claim. Defendant later references testimony by Michael Gomez that SDRTC was submitting budget-based invoices in 2012 and other testimony that suggested that Defendant paid invoices to SDRTC despite knowing those invoices were fraudulent. (*Id.*) Defendant cites excerpts of the trial transcript, but the excerpt of Mr. Gomez's testimony does not appear to concern SDRTC's billing practices or allegations that they were fraudulent. (*See* Wheeler Decl. re:JMOL (ECF No. 248-2), Ex. A.) In reviewing Mr. Gomez's testimony beyond the excerpt provided by Defendant, it appears that Mr. Gomez did testify about SDRTC submitting budget-based billing in 2012. However, Defendant raised no contemporaneous objection to that testimony:

> Q: Okay. Now, while you were the bureau chief of TPS, if you can remember -- I know this is awhile ago -- was San Diego Regional Training Center submitting actual or budgeted billing?
>
> A: Budget billing.
>
> Q: And that would have been beginning -- your experience with it any way beginning in late '11 and for most of 2012?
>
> A: Yes.

1

2      Q: Okay. And did that ever change while you were in
          charge of TPS that they actually went to actual billing?

3

4      A: No.

5      Q: Did you ever try to make San Diego Regional Training
          Center submit actual invoicing instead of budget

6          invoicing?

7      A: No.

8

9    (9/4/24 Tr. at 247:4–16.)  In fact, Defendant's counsel themselves questioned Mr.

10   Gomez about whether SDRTC had submitted budget-based billing while Mr. Gomez

11   was Bureau Chief:

12

13     Q: And then you said that you assured that San Diego
          Regional was submitting budget-based billing while

14        you were the bureau chief; is that right?

15     A: Correct.

16

17   (*Id.* at 380:3–6.)

18        Defendant references other testimony that allegedly contradicted the order in

19   the qui tam action but Defendant's only citation in this regard is to Mr. Gomez's

20   testimony where Defendant failed to raise any objection.  The failure of Defendant to

21   object alone is fatal to Plaintiff's claim that the admission of this testimony was in error.

22   Fed. R. Evid. 103(a)(1); *United States v. Rivera*, 43 F.3d 1291, 1295 (9th Cir. 1995)

23   ("Failure to make a timely objection constitutes a waiver of that objection."); *see*

24   *Workplace Techs. Rsch., Inc. v. Project Mgmt. Inst., Inc.*, 664 F. Supp. 3d 1142, 1153

25   (S.D. Cal. 2023) ("Post-trial motions are not the proper juncture for the Parties to raise

26   evidentiary objections they failed to raise before or during trial."); *see also* Fed. R.

27   Evid. 103(e) ("A court may take notice of a plain error affecting a substantial right, even

28   if the claim of error was not properly preserved.")

However, even if Defendant had objected to this testimony, it is not clear that such testimony was improper. Witnesses testify from their memories about what occurred at a prior time. The testimony of witnesses, including Mr. Gomez, about their beliefs and perceptions is undoubtedly relevant information for the jury to determine whether Plaintiff believed that she was disclosing evidence of improper governmental activity. Defendant was free to impeach witnesses about the accuracy of those beliefs or present evidence showing them to be clearly false to establish that Plaintiff's communications could not have evidenced improper governmental activity. The failure to do so does not constitute a basis for a new trial.

Similarly, Defendant's complaints about witnesses who testified that they believed SDRTC's practices were "fraudulent" are unavailing. The only testimony cited by Defendant is the testimony of D'Karla Davis who testified that she believed SDRTC's billing practices were fraudulent. (New Trial Mot. at 7.) However, Defendant again did not raise any objection to this testimony. (9/6/24 Tr. at 483–85.)[4]

Moreover, it was not improper for witnesses to testify about their perception of SDRTC and POST's practices. To prove her claim, Plaintiff was required to show at trial that she made a good faith disclosure that may have evidenced improper governmental activity. As stated previously, Judge England did not allow Plaintiff to continue on the theory that POST or SDRTC's conduct was actually fraudulent, but expressly permitted Plaintiff to proceed on the theory that "she believed in good faith that RTC's conduct was unlawful." (ECF No. 129 at 17 (emphasis in original).) The testimony of witnesses about their perception of SDRTC's and POST's activities is undoubtedly relevant to whether Plaintiff had a good faith belief about the lawfulness of the invoices. It is certainly true that testimony about the invoices as "fraudulent" is close to the line of arguing the actual unlawfulness of the activity. But even in the portion of the transcript included in the Motion, the testimony presented all appears

---

[4] Defendant erroneously cites page 486 of the September 6, 2024, transcript but the excerpt cited by Defendant is found on page 484 at lines 1–10.

1    to be the witnesses' perceptions of those activities and is thus plainly relevant and

2    does not conflict with the ruling in the qui tam action.

3         Finally, evidence related to CalEMA's audit and the ultimate results of that audit

4    are also relevant for this same purpose.  While there was conflicting evidence

5    presented to the Jury about who informed the CalEMA auditors about the invoicing

6    issue with SDRTC and what led to the adverse finding, the adverse finding is clearly

7    relevant to whether Plaintiff properly believed that there was an issue with the

8    invoicing and documentation provided by SDRTC and POST's payment of those

9    invoices.  Defendant argues that Plaintiff sought to paint a picture that Defendant paid

10   fraudulent invoices and conspired with SDRTC to violate the law.  In reality, Plaintiff

11   was properly using this evidence to establish for the jury that she had, in good faith,

12   disclosed or attempted to disclose information that may have evidenced improper

13   government activity – whether or not improper government activity had ultimately

14   occurred.

15        In short, the scope of Plaintiff's claim following the ruling of Judge England in

16   the qui tam action meant that to prove her claim, she was necessarily required to

17   present evidence that she had reason to believe that SDRTC and POST were engaged

18   in improper government activity and that she had engaged in good faith

19   communication of information that may have evidenced that improper governmental

20   activity.  The evidence presented at trial was proper to establish those necessary facts

21   for the jury without contradicting the results of the qui tam action.  Defendant had

22   ample opportunity to contest the validity of Plaintiff's belief and whether or not her

23   communication may have evidenced improper governmental activity both in cross-

24   examination and during evidence presented during Defendant's case-in-chief.

25   Accordingly, Defendant's Rule 59 Motion on this basis is denied.

26   **B.  Testimony of Dr. Todd Langus**

27        The testimony of witness Dr. Todd Langus was not improper opinion testimony,

28   despite Defendant's argument to the contrary.  The Court permitted Dr. Langus to

1    testify about his perception of Plaintiff and the effects of her termination.  While Dr.

2    Langus did opine about Plaintiff's mental state, none of Dr. Langus' testimony stepped

3    beyond the bounds of what would be permissible for a layperson, especially in the full

4    context of those statements.  For example, one portion of testimony from which

5    Defendant draws several quotes says the following:

6

7        [BY MR. BOHM:]
        Q: And Dr. Langus, have you -- again, just using your friend
8           hat, not your psychological hat, have you observed
            whether Ms. Evans was harmed by the termination she
9           had from POST?

10       A: Absolutely.

11
        Q: And have you witnessed firsthand any damaging impact
12          to Ms. Evans from her termination?

13       A: Yes.

14
        Q: And so let's do the 30,000-foot view first, and then I'll
15          dig in as to some specifics. Can you help this jury
            understand, as somebody who's known Ms. Evans for --
16          for all those eleven years that she's been fired, how has
            that timeframe been to her?
17

18       A: Excruciating.

19
        Q: And why do you say that?
20
         A: Because her life was taken from her.
21

22       Q: And why do you say that?

23       A: Because when -- when you are in law enforcement, it is
            not just who you are, it's -- it's not just what you
24          become, like some occupations. It becomes who you
            are. It's your persona.
25

26       Q: Okay. And so what does that look like? Because these
            folks don't -- they don't spend time with Ms. Evans, so
27          what does it look like when you see Ms. Evans and she's
            -- she's in a bad place with regard to what happened
28

1                     with POST? What do you see? What do you observe?
2                     Not what she says, but what do you see?

3               A: Anxiety, depression, hopelessness --

4               MS. CHUN: Objection, move to strike.

5               THE WITNESS: -- Despair.

6
7               MS. CHUN: This is improper layperson opinion.

8               THE COURT: Overruled. I'll just instruct the jury, I mean,
                   you know, I think that you can interpret that in the
9                     colloquial sense of the question, not as a diagnosis. He
                   did not treat Ms. Evans.
10

11              BY MR. BOHM:
             Q: You heard all that, right? That's what you're using?
12                    You're using -- I mean, somebody can say, hey –

13              A: These are lay terms.

14
15              Q: Yeah. Okay. Continue. What else did you see?

16              A: Excuse me for hesitating. I'm just trying to think of words
                   that won't upset anybody.
17                    Distraught, tearfulness.
                   It's like if you ever witnessed or had it yourself, losing
18                    somebody that you love, what you go through, what
                   you feel, it's the exact same way. It's a trauma that you
19                    go through.
                   Obsessive thoughts and ruminations over what has
20                    happened over and over again, intrusive recollections
                   that she would come up and talk about at times.
21

22

23 (9/10/24 Tr. (ECF No. 229) at 1175:2–1176:23.)

24         In context, it is clear that Dr. Langus was testifying regarding his own personal

25 observations as a percipient witness to Plaintiff's condition.  Both Plaintiff's counsel

26 and Dr. Langus went to great lengths to be clear that he was simply providing his

27 perceptions of what occurred as a lay individual.  Certainly, terms such as "anxiety" or

28 "trauma" can be used in a clinical capacity, but they also serve as common terms for

1  effects a layperson could observe. *See Mouradian v. City of Los Angeles*, No. 21-cv-

2  3880-DMG-SHKx, 2023 WL 2558398, at *3 (C.D. Cal. Jan. 25, 2023). Given the context

3  of Plaintiff's Counsel's questions and Dr. Langus' answers, it is clear that this was the

4  nature of Dr. Langus' testimony and, as such, it was not improper.

5        Additionally, the Court expressly instructed the jury of the following at the start

6  of Dr. Langus' testimony regarding his observations:

7

8       [W]e previously had a witness who was qualified to
   give expert opinion -- or not expert opinion, just opinion
   because of their specialized knowledge, skill and expertise.

9       While this gentleman, witness, may have such
   expertise, that's not why he's here, so I'm instructing you to

10  only consider his testimony, his lay testimony, which can
    only be based on inferences drawn from the witness's

11  direct perceptions and must be rationally based on those
    perceptions and not on speculation and what someone

12  else has said.
         A lay witness may not rely on facts that are not based

13  on his or her own personal observations or involvement

14  and you should judge this testimony like any other
    testimony and you should not give it any extra credence

15  based on the specialized knowledge, skill, experience,
    training or education of the witness.

16

17

18  (9/10/24 Tr. at 1166:18–1167:7.) The Court later reminded the jury of this instruction

19  when Dr. Langus resumed his testimony the following day. (9/11/24 Tr. at 1186:4–7.)

20  Thus, to the extent that Dr. Langus' testimony could have been improperly interpreted

21  by the jury as expert testimony, the Court provided clear and repeated instructions to

22  prevent such a misinterpretation. Accordingly, Defendant's Motion for New Trial is

23  denied on this ground.

24       **C.  Favorable Character Evidence**

25       The Court also properly permitted Plaintiff to introduce limited character

26  evidence that was closely tailored to her work performance. Defendant argued at trial

27  and continue to argue that Plaintiff was terminated for legitimate reasons independent

28  from Plaintiff's protected disclosure. Many of the grounds for termination cited

1  concerned Plaintiff's character and conduct as a POST employee.  The "Statement of

2  Causes" section of Notice of Adverse Action alone lists the following grounds for

3  Plaintiff's termination: (1) incompetency, (2) inexcusable neglect of duty, (3)

4  insubordination, (4) dishonesty, (5) discourteous treatment of the public or other

5  employees, (6) misuse of state property/time/equipment, (7) other failure of good

6  behavior either during or outside of duty hours which is of such a nature it causes

7  discredit to the appointing authority or the person's employment, and (8) unlawful

8  discrimination.  (Trial Ex. 230 (Wheeler Decl. (ECF No. 249-2), Ex. B) at 2–3.)  The

9  Notice of Adverse Action and the investigation report produced by Ms. Brewer, which

10  was relied on in large part to terminate Plaintiff, further impugn Plaintiff's character

11  and conduct as a POST employee.  (*See* Trial Exs. 230, A.)

12  　　　At trial, Plaintiff argued that Defendant's claimed grounds for termination were

13  pretextual.  This put the accuracy of the representations about how Plaintiff conducted

14  herself while employed at POST, as contained in the Notice of Adverse Action and Ms.

15  Brewer's investigation report, squarely at issue.  Thus, testimony regarding this is

16  relevant to whether the cited grounds for termination were a pretext to justify taking

17  adverse employment action against Plaintiff and that a substantial motivating reason

18  for that action was Plaintiff's protected disclosure.  *See Mendoza v. W. Med. Cntr.*

19  *Santa Ana*, 222 Cal. App. 4th 1334, 1344 (2014) (noting that an employee was "[an]

20  excellent, long term employee" as relevant to whether there was sufficient evidence

21  for the jury to conclude that a report of sexual harassment was the substantial

22  motivating reason for the employee's termination); *see also Holmes v. Gen. Dynamics*

23  *Corp.*, 17 Cal. App. 4th 1418, 1435 (1993) (noting that "undisputed evidence

24  established Holmes had been an outstanding employee for his thirteen years" as

25  relevant to whether a termination was pretextual).

26  　　　To protect against improper character evidence, the Court carefully sought to

27  limit such evidence to testimony that was specifically related to the claims about

28  Plaintiff's performance and conduct discussed in the Notice of Adverse Action and the

1    investigation report.  For example, the Court originally disallowed testimony from

2    Emmett Spraktes related to Plaintiff's performance (*see* 9/3/24 Tr. at 118:19–119:11)

3    but later permitted Mr. Spraktes to give limited testimony once it was clear that he

4    worked with Plaintiff as a contractor and thus could provide testimony that was

5    relevant to Plaintiff's conduct and her honesty (or dishonesty) in dealing with

6    contractors as a POST employee (*see* 9/6/24 Tr. at 559:24–560:20).  Defendant states

7    that "the Notice of Adverse Action does not reflect that Plaintiff was terminated for

8    failing to adequately perform her job duties as a Law Enforcement Consultant[]"  (New

9    Trial Reply at 6), and that "it was undisputed that Plaintiff was a fine employee[]" (*id.*).

10   But this is inaccurate.  As noted, the Statement of Causes in the Notice of Adverse

11   Action suggests that Plaintiff was subject to adverse action for numerous reasons

12   including "[i]ncompetence" and "[i]nexcusable neglect of duty."  (Trial Ex. 230 at 2.)

13   This places Plaintiff's performance as a POST employee squarely at the center of

14   whether Plaintiff's termination was pretextual.

15          Defendant also suggests that ". . . the primary reason Plaintiff introduced

16   character evidence was to contradict evidence related to the [Enterprise]

17   incident . . . ."  (New Trial Mot. at 12.)  However, the vast majority of such testimony

18   elicited by Plaintiff at trial concerned Plaintiff's conduct as a POST employee.  As

19   discussed, this evidence was proper in the context of the trial.  Plaintiff's Counsel also

20   questioned some witnesses as to whether they had heard Plaintiff call anyone the slur

21   that she had allegedly used during the Enterprise incident.  This testimony was at least

22   somewhat relevant to whether Plaintiff was known to act appropriately and whether

23   her termination was pretextual.  It is true that this testimony is prejudicial given the

24   connection to the Enterprise incident, but Defendant never raised a

25   contemporaneous objection under Federal Rules of Evidence 402, 403, or 404 to any

26   testimony as to whether Plaintiff was known to use the slur.  (*See* 9/6/24 Tr. at 557:20–

27   25 (objection only raised on foundation grounds); 9/10/24 Tr. at 1085:20–25 (no

28   objection raised); *id.* at 1148:18–21 (no objection raised); *id.* at 1154:19–22 (no

1  objection raised); *id.* at 1157:17–19 (no objection raised).)  Defendant also did not

2  raise this issue in Defendant's Motions in Limine before trial.[5]  (*See* ECF No. 150.)

3  Defendant's failure to raise timely objections to the introduction of this testimony is

4  fatal to this argument as permitting this testimony was not plain error affecting a

5  substantial right.  Fed. R. Evid. 103(a)(1); *Rivera*, 43 F.3d at 1295; *see Workplace*

6  *Techs. Rsch.*, 664 F. Supp. 3d at 1153; *see also* Fed. R. Evid. 103(e).

7          Based on the above, the Court finds that the Court did not permit improper

8  character evidence to be presented to the Jury.  Defendant's Motion for New Trial on

9  this basis is thus denied.

10  **D.  State Personnel Board Testimony of Anne Santos**

11         The Court properly excluded Anne Santos' testimony before the State

12  Personnel Board.  Defendant sought to have that testimony read into the record on

13  the basis that Ms. Santos was unavailable.  The Court denied that request on the basis

14  that these statements were hearsay and Defendant had not established that Ms.

15  Santos was unavailable to testify.  Specifically, the Court noted that unlike the Federal

16  Rule of Civil Procedure 32, which explicitly defines witnesses 100 miles away as

17  unavailable, Federal Rule of Evidence 804(a)(5) states that a declarant is unavailable if

18  they are "absent from the trial or hearing and the statement's proponent has not been

19  able, by process <u>or other reasonable means</u>, to procure" their attendance.  Fed. R.

20  Evid. 804(a) (emphasis added).  "[That] Rule requires that the proponent of using the

21  testimony make a 'genuine and bona fide' and 'diligent effort' to secure the witness's

22  voluntary attendance at trial."  *Knickerbocker v. Corinthian Coll., Inc.*, No. 12-cv-01142-

23  JLR, 2013 WL 12414926, at *2 (W.D. Wash. July 10, 2013); *see United States v. Yida*,

24  498 F.3d 945, 952 (9th Cir. 2007) ("Thus, even where the absent witness is beyond the

25  ////

26

27  [5] Toward the start of trial, the Court even ordered additional briefing concerning the usage of character evidence in connection with Mr. Spraktes. (*See* ECF Nos. 186, 188.)  But Defendant also did not raise any objections to specific testimony at this time.  Instead, Defendant sought to exclude character

28  evidence generally and specifically the testimony of Mr. Spraktes and Dr. Langus.  (*See* ECF No. 186)

1    court's jurisdiction, the government must show diligent effort on its part to secure the

2    witness' voluntary return to testify." (cleaned up).)

3        In seeking to use the transcript, Defendant's only ground for doing so was that

4    they had "located" Ms. Santos in Georgia.  If Ms. Santos resided in Georgia at the time

5    of trial, she would have been beyond the subpoena power of the Court.  However,

6    Defendant made no representations that they had taken <u>any</u> steps to secure her

7    attendance at the trial by voluntary means.  The cases cited by Defendant in their

8    Motion contain little to no substantive discussion of Rule 804 and do not address

9    whether the witness in question refused to testify voluntarily.[6]  Rule 804(a)(5) is clear

10   that a declarant is only considered unavailable if their appearance cannot be secured

11   by process or other reasonable means.  Defendant failed to show that they had taken

12   any steps to procure Ms. Santos's attendance at trial.  As such, Ms. Santos' statements

13   to the state personnel board did not fall within Rule 804's exception for hearsay.

14       For similar reasons, the residual exception of Federal Rule of Evidence 807

15   does not apply.  For a hearsay statement to be admissible under Rule 807 it must be

16   "more probative on the point for which it is offered than <u>any other evidence that the</u>

17   <u>proponent can obtain through reasonable efforts</u>."  Fed. R. Evid. 807(a)(2).  Defendant

18   failed to establish that the evidence at issue could not be obtained through

19   reasonable efforts, most notably, seeking to secure Ms. Santos' voluntary attendance

20   at trial.

21       Given the above, the Court properly excluded the state personnel board

22   testimony of Ms. Santos as hearsay without an applicable exception.  Defendant's

23   Motion for New Trial on this basis is denied.

24

25   [6] While it does not directly discuss this issue, the Court notes that in *In re Kirkland*, 75 F.4th 1030, 1046 (9th Cir. 2023), which Defendant cites in support of the proposition that an individual outside the

26   subpoena power of the Court is unavailable for purposes of Rule 804, the Ninth Circuit includes a quote from *In re Guthrie*, 733 F.2d 634, 637 (4th Cir. 1984), in which the Fourth Circuit stated that "a nonparty

27   witness outside the state in which the district court sits, and not within the 100-mile bulge, may not be compelled to attend a hearing or trial, and the only remedy available to litigants, <u>if the witness will not</u> <u>attend voluntarily</u>, is to take his deposition . . . ." (emphasis added).  This again suggests that the Ninth

28   Circuit grants weight to the "other reasonable means" requirement of Rule 804.

1

**E.  The Jury's Award of Non-Economic Damages**

2    The Court does not find that the non-economic damages awarded by the jury

3 are excessive or without evidentiary basis.  A jury's award of damages is afforded

4 deference by the Court unless the amount awarded is "grossly excessive or

5 monstrous, clearly not supported by the evidence, or based only on speculation or

6 guesswork." *McCollough v. Johnson, Rodenburg & Lauinger, LLC*, 637 F.3d 939, 957

7 (9th Cir. 2011).  This is not the case for either the past or future non-economic

8 damages awarded by the jury.

9    For the past non-economic damages, Plaintiff presented ample evidence that

10 she was subject to numerous adverse circumstances towards the end of her

11 employment that caused her great emotional distress.  She presented evidence about

12 the conditions under which she was removed as well as the non-economic effects of

13 the termination.  This evidence came in both the form of Plaintiff's own testimony as

14 well as the testimony of multiple of Plaintiff's former coworkers.  While Defendant

15 complains that "[t]here was no competent medical testimony that Plaintiff suffered

16 from any mental health condition or that she was prescribed any sort of medication for

17 any mental health condition attributable to the conduct of POST[,]" (New Trial Mot. at

18 16,)  Defendant cites no authority that such evidence is necessary to support the

19 awarded damages.

20    In fact, "[n]umerous cases approve the award of emotional distress damages

21 based on the testimony of nonexpert witnesses." *Knutson v. Foster*, 25 Cal. App. 5th

22 1075, 1096 (2018).  As stated by California's Second District Court of Appeal in

23 *Corenbaum v. Lampkin*:

24
25
26
27
28

> Noneconomic damages compensate an injured plaintiff for
> nonpecuniary injuries, including pain and suffering. Pain
> and suffering is a unitary concept that encompasses
> physical pain and various forms of mental anguish and
> emotional distress.  Such injuries are subjective, and the
> determination of the amount of damages by the trier of fact
> is equally subjective.  There is no fixed standard to

26

determine the amount of noneconomic damages. Instead, the determination is committed to the discretion of the trier of fact.

215 Cal. App. 4th 1308, 1332 (2013) (citations omitted).  California law provides no specific measure for determining whether non-economic damages are warranted and "[t]he law in [California] is that the testimony of a single person, including the plaintiff, may be sufficient to support an award of emotional distress damages." *Knutson*, 25 Cal. App. 5th at 1096 (emphasis in original).  Thus, the evidence presented by Plaintiff at trial is legally sufficient to support the past non-economic damages awarded by the jury.

As to future non-economic damages, the evidence presented by Plaintiff was also sufficient for the jury to find Plaintiff suffered the damages awarded.  Multiple witnesses, including Plaintiff herself, testified about the ongoing social impacts of the termination on her law enforcement career, the damage to her identity, and the harm caused to her mental health.  (*See, e.g.*, 9/10/24 Tr. at 1149:11–17 (Mr. Spraktes mentioning the difficulty in moving beyond the termination); *id.* at 1175:15–20 (Dr. Langus discussing how Plaintiff was impacted by the loss of her law enforcement "persona"); *id.* at 1094:20–1095:8 (April Crume discussing the reputational harm to Plaintiff and the difficulty she would face in gaining employment going forward); 9/11/24 Tr. at 1187 (Dr. Langus discussing the effect of Plaintiff losing her job on her mood); 9/13/14 Tr. (ECF No. 231) at 1480:14–19 (Plaintiff discussing her loss of identity); *id.* 1508:18–1509:12 (Plaintiff discussing the loss of her reputation).)  This testimony was sufficient to support the jury awarding future non-economic damages.

### F.  Reduction of Reward

The Court also declines to reduce the damages awarded by the jury or order a new trial on that basis.  "In reviewing a jury's damages award, we must uphold the jury's finding of the amount of damages unless the amount is grossly excessive or monstrous, clearly not supported by the evidence, or only based on speculation or

1    guesswork." *L.A. Mem'l Coliseum Comm'n v. National Football League*, 791 F.2d

2    1356, 1360 (9th Cir. 1986) (cleaned up).  The Court does not generally find that the

3    amount of damages awarded was grossly excessive or monstrous.  With the exception

4    of future economic damages which are discussed further below, the damages

5    awarded were supported by the evidence and not based on speculation or

6    guesswork.

7        The cases cited by Defendant in their motion do not convince the Court

8    otherwise.  As Defendant themselves note, "it is difficult to make direct comparisons

9    between this case and others, as the facts of every case are unique . . . ." (Rule 59 Mot.

10   at 23;) *see Bertero v. Nat'l Gen. Corp.*, 13 Cal.3d 43, 65 n.12 (1974) ("For a reviewing

11   court to upset a jury's factual determination on the basis of what other juries awarded

12   to other plaintiffs for other injuries in other cases based upon different evidence

13   would constitute a serious invasion into the realm of fact-finding.").  The differences in

14   facts and evidence between this case and those cited by Defendant render them an

15   unpersuasive basis to order a new trial or reduce the jury's award.  *See Kingston v. Int'l*

16   *Bus. Machs. Corp.*, No. 21-35548, 2022 WL 3031590, at *2 (9th Cir. 2022) (ordering

17   remitter of $6 million non-economic damages of a total $11 million award on the basis

18   that the plaintiff did not present evidence that showed his distress was "significantly

19   greater than what anyone might suffer from being fired."); *see also Briley v. City of*

20   *West Covina*, 66 Cal. App. 5th 119, 141–44 (2021) (remanding for new trial based on

21   excessive noneconomic damages based on the lack of evidence regarding the

22   impacts of termination beyond the plaintiff's testimony that only established the usual

23   harms from termination).  Specifically, none of these cases involve a termination from

24   a law enforcement position on the grounds for which Plaintiff was terminated in the

25   unique factual background and posture of this case.

26       Accordingly, with the exception of future economic damages, Plaintiff's Motion

27   for New Trial on this basis is denied.

28   *////*

28

1          **1. Future Economic Damages**

2          In the Rule 60 portion of their Motion, Defendant also raises that the Jury

3    appears to have awarded future economic loss at full value without reducing it to

4    present value.  This issue is more properly addressed here under Rule 59 on the basis

5    of whether these damages are supported by the evidence.  The relevant portion of the

6    verdict form completed by the Jury states the following:

> **Question No. 8:** What are Tamara Evans' damages?
>
> **Economic Damages**
> Past Lost Earnings                    $ 1,239,956
> Future Lost Earnings                  $ 1,566,600
>
> **Non-Economic Damages**
> Past Non-Economic Damages             $ 3,400,000
> Future Non-Economic Damages           $ 2,000,000
>
> **Total Damages**                     $ 8,763,286
>
> *If you awarded economic damages (whether past lost earnings, future lost earnings, or both) in Question No. 8, proceed to Question No. 9.  If you did not award economic damages, proceed directly to Question No. 10.*
>
> **Question No. 9:** What portion of the economic damages awarded were for tax neutralization purposes?
>
>          $  556,730
>
> *Proceed to Question No. 10.*

23    (ECF No. 218 at 4.)

24          Defendant argues that the Jury inadvertently provided an incorrect future

25    economic loss amount unsupported by the evidence by failing to account for the

26    present discounted value.  On this point, the Court is persuaded.  Plaintiff's expert, Dr.

27    Phillip Allman, testified at trial regarding his calculation of Plaintiff's economic losses.

28    During his testimony, Dr. Allman explained "present discounted value" as well as how

29

1   he had calculated the "full value" and "present discounted value" of Plaintiff's

2   economic losses. (9/16/24 Tr. (ECF No. 255) at 166:10–170:12.) These amounts were

3   represented in the summary chart produced by Dr. Allman.

4

5

| ECONOMIC LOSS SUMMARY FOR TAMARA EVANS (Updated for September 2024 Trial Date) | | |
|---|---|---|
| | Full Value | Present Discounted Value |
| **PAST EARNINGS WITH EMPLOYMENT WITH CC POST** | | |
| Wages | $ 1,425,988 [1] | $ 1,425,988 [1] |
| Health Insurance | $ 90,643 [2] | $ 90,643 [2] |
| Employee Pension Contributions (Offset) | $ (114,079) [A] | $ (114,079) [A] |
| | $ 1,402,552 | $ 1,402,552 |
| **PAST EARNINGS WITHOUT EMPLOYMENT WITH CC POST** | | |
| Mitigating CalPERS Pension (Offset) | $ (162,596) [3] | $ (162,596) [3] |
| **NET PAST ECONOMIC LOSS** | $ 1,239,956 | $ 1,239,956 |
| **FUTURE EARNINGS WITH EMPLOYMENT WITH CC POST** | | |
| Wages | $ 133,298 [5] | $ 129,176 [5] |
| Health Insurance | $ 7,611 [6] | $ 7,375 [6] |
| Employee Pension Contributions (Offset) | $ (10,664) [A] | $ (10,334) [A] |
| Without-Termination Pension Income | $ 1,822,794 [8] | $ 1,255,641 [8] |
| | $ 1,953,039 | $ 1,381,857 |
| **FUTURE EARNINGS WITHOUT EMPLOYMENT WITH CC POST** | | |
| Mitigating CalPERS Pension (Offset) | $ (386,433) [7] | $ (269,944) [7] |
| **NET FUTURE ECONOMIC LOSS** | $ 1,566,606 | $ 1,111,913 |
| **NET PAST PLUS NET FUTURE ECONOMIC LOSS** | $ 2,806,562 | $ 2,351,869 |
| **TAX NEUTRALIZATION AMOUNT FOR ADVERSE TAX CONSEQUENCE OF LUMP SUM AWARD** | $ 556,730 [9] | $ 556,730 [9] |
| **TOTAL ECONOMIC LOSS ADJUSTED FOR TAX NEUTRALIZATION** | $ 3,363,292 | $ 2,908,599 |

Note: all numbered footnotes refer to table numbers.
A. 8.0% (employee contribution to CalPERS pension as a percent of Wages (as of 7/1/23; source: 2023 MOU) x Wages.

23   (*See* Trial Ex. 309 (Wheeler Decl. (ECF No. 249-2), Ex. D) at 1.) Dr. Allman testified that

24   the total present discounted value of Plaintiff's future losses was $1,111,913, while the

25   full value of the future losses would have been $1,566,606. (9/16/24 Tr. at 175:24–

26   176:2; Trial Ex. 309 at 1.)

27       In awarding Plaintiff damages, the Jury appears to have pulled directly from Dr.

28   Allman's calculations. This can be seen by comparing the amounts awarded on the

1    verdict form with Dr. Allman's summary chart.  For example, the past economic

2    damages ($1,239,956) and the tax neutralization ($556,730) granted by the jury are

3    identical to those found in Dr. Allman's report.  (ECF No. 218 at 4; Trial Ex. 309 at 1.)

4    Moreover, the future economic loss amount awarded by the jury is functionally

5    identical to the "full value" amount calculated by Dr. Allman.[7]  (*Id.*)

6         The testimony at trial supported awarding the present discounted value for

7    future economic loss.  It did not support awarding the full value.  Dr. Allman testified

8    that in calculating a value to be obtained in the future, interest on the lump sum of

9    cash awarded now needed to be taken into account.  (9/16/24 Tr. at 166:24–167:5)

10   The Jury was similarly instructed that "any award for future economic damages must

11   be for the present cash value of those damages."  (Jury Instructions at 22.)  Neither Dr.

12   Allman nor Kristoffer Hall, Defendant's economic evaluation expert, provided support

13   for a present discounted valuation of $1,566,600.  Thus, a verdict of this amount is

14   unsupported by the evidence.  *L.A. Mem'l Coliseum Comm'n*, 791 F.2d at 1360.

15        Plaintiff argues that the Court should not reduce the amount because

16   Defendant "has the burden of proving the appropriate method for calculating present

17   value[,]" but has not done so.  (Opp'n to Rule 59 Mot. at 28.)  Plaintiff relies on *Lewis v.*

18   *Ukran,* 36 Cal. App. 5th 886 (1989), in which a California appellate court affirmed a

19   trial court's decision to not reduce future damages to "present cash value" after the

20   trial had ended.  *Lewis* is clearly distinguishable.  In *Lewis*, neither party had presented

21   any evidence "of appropriate discount or inflation rates, or the appropriate method of

22   calculating present cash value."  *Id.* at 894.  The appellate court held that without

23   evidence the trial court should not sua sponte determine an appropriate present

24   discounted value.  *Id.* at 896.  Here, as discussed, there was evidence presented by

25   ////

26

27   _____

     [7] There is a six dollar difference between the $1,566,600 awarded by the jury and the $1,566,606 in full
28   value future economic harms calculated by Dr. Allman, but this difference is not meaningful and seems
     likely attributed to a transcription error.

1   both parties at trial about the appropriate present discounted value.[8]  This is not a

2   case like *Lewis* where the complete lack of evidence regarding present discounted

3   value creates a situation where the Court would be forced to make its own

4   determination of damages.

5          As the Court has determined that the damages awarded by the Jury are

6   excessive, the Court has the option to grant a new trial or deny the motion conditional

7   on the Plaintiff accepting a remittitur.  *Fenner v. Dependable Trucking Co.*, 716 F.2d

8   598, 603 (9th Cir. 1983).  The Court here declines to grant a new trial and instead

9   denies the motion conditional on the Plaintiff accepting a remittitur.  "The prevailing

10  party is given the option of either submitting to a new trial or of accepting a reduced

11  amount of damage which the court considers justified." *Id.*  The remittitur must reflect

12  "the maximum amount sustainable by the proof." *D & S Redi-Mix v. Sierra Redi-Mix &*

13  *Contracting Co.*, 692 F.2d 1245, 1249 (9th Cir. 1982).

14         Dr. Allman's $1,111,913 figure was the highest supported amount for the

15  present discounted value on future economic damages.  As noted, it was also clearly

16  the Jury's intent to follow the economic damages figures proposed by Dr. Allman.  As

17  such, a reduction of the future economic damages awarded to that amount

18  ($1,111,913) is warranted given it was the highest amount of future economic

19  damages sustainable by the proof.

20         Accordingly, Defendant's Motion for New Trial under Rule 59 is denied

21  conditional on Plaintiff accepting a remitter of future economic damages to

22  $1,111,913.  Plaintiff will be given the option to accept the remittitur – at which time

23  judgment will be entered for this amount – or to not consent – at which time a new

24  trial shall be granted.  *Fenner*, 716 F.2d at 603.

25  ////

26

---

27  [8] Defendant's economic evaluation expert, Kristoffer Hall, and Dr. Allman disagreed somewhat over the exact method that is appropriate for calculating present discounted value.  (*See* 9/17/24 Tr. at 73:7–74:7.)  The distance between the amounts each party's expert advocated is not substantially but both sides did present evidence about calculating present discounted value.

28

1

**RULE 60 MOTION**

2      Defendant asks that the Court "correct the verdict form and clarify the total

3  award" based on an alleged inconsistency in the verdict form under Federal Rule of

4  Civil Procedure 60(a).  Rule 60(a) provides a means for correcting clerical mistakes "in

5  a judgment, order, or other party of the record."  Fed. R. Civ. P. 60(a).  "In determining

6  whether a mistake may be corrected under Rule 60(a), our circuit focuses on what the

7  court originally intended to do."  *Tattersalls, Ltd. v. DeHaven*, 745 F.3d 1294, 1297

8  (2014) (internal citation, quotations, and emphasis omitted).  The touchstone for Rule

9  60(a) is "fidelity to the intent behind the original judgment."  *Garamendi v. Henin*, 683

10  F.3d 1069, 1078 (9th Cir. 2012).

11      Defendant finally argues that the Court should "correct" the verdict form to

12  clarify that the total award is $8,308,599 because "it appears that the jury intended,

13  but neglected, to add in the tax neutralization figure ($556,730) into the economic

14  damages that it awarded . . . [and] failed to reduce the future economic loss to present

15  value."  The latter portion has already been addressed above.  *See supra* Rule 59 Mot.

16  II.F.1.

17      As to the former argument, Defendant contends that the verdict should be

18  reduced to the pure total of the "Economic Damages" and "Non-Economic Damages"

19  subsections from Question No. 8 (for a total of $8,206,556), ignoring the tax

20  neutralization amount contained in Question No. 9.  The difference between the "Total

21  Damages" awarded by the Jury in Question No. 8 ($8,763,286) and the total of the

22  prior "Economic Damages" and "Non-Economic Damages" subsections in Question

23  No. 8 ($8,206,556) is precisely equal to the tax neutralization amount provided by the

24  Jury in Question No. 9, $556,730.  Thus, it is abundantly clear that the Jury intended

25  the tax neutralization amount they provided to be included in the damages they

26  awarded, and the "Total Damages" number provided is not an arithmetic error.

27  Despite this, Defendant argues that the difference between the total of the

28  subsections and the Total Damages "cannot be properly explained by adding the

1   amount listed for tax neutralization in Question 9 ($556,730), as it was made clear to

2   all parties and the jury that the tax neutralization amount for Question 9 was <u>not</u> an

3   additional amount to be awarded, but simply a reflection of the portion, if any, of the

4   economic damages award–$2,806,556–attributable to tax neutralization." (Reply

5   re:Rule 59 Mot. at 11 (emphasis in original).)

6      At first, the Court did intend the amount provided in Question No. 9 to

7   represent a portion of the economic damages amount awarded. (9/24/24 Tr. at

8   115:2–7 ("Maybe the better way to do it, and what I'm contemplating, is adding a line

9   under economic damages. We have past and future, adding a line for tax

10  neutralization amount so we know exactly what the jury is assigning . . . .").) After the

11  Jury sent out a note, confused by where they should include the tax neutralization and

12  on further discussion with the parties, the Court contemplated permitting the Jury to

13  either include that amount in the economic damages or exclude it. (9/26/24 Tr. (ECF

14  No. 244) at 5:10–14 ("So maybe what I'll say is: If you included in your totals for

15  economic damages tax neutralization, we'd like to know how much that is. If you

16  didn't include that amount in your calculation and you do award tax neutralization,

17  indicate it here.").) Ultimately though, the Court changed course and determined it

18  would be better for tax neutralization to be included in the "Total Damages" but to

19  have it then separated out:

20

21      THE COURT: I mean, I -- so actually, as I'm looking at it, I
        think I'm going to tell them that when you award total
22      damages, that should include any amount you award for
        tax neutralization. That is the total damages. And this is the
23      verdict form you all proposed before we separated out tax
        neutralization, so you all thought that this included tax
24      neutralization in total damages. We've added a line to
        capture what that amount is, and I'm going to tell them
25      total damages should include tax neutralization if you
        award any. If you do award any, just tell us what that
26      amount is in Question No. 9.

27

28  ////

34

1  (*Id.* at 6:9–18.)  When the Jury returned to the courtroom for the Court to respond to

2  their note, the Court repeated this as the instruction to the Jury:

4           THE COURT: Okay. Fair enough. So the idea is that the
            total amount of damages that you award should go -- if you
5           award damages, goes into Question 8. <u>If, as part of that</u>
            <u>total damages, you decide to award tax neutralization,</u>
6           <u>amount for tax neutralization, you should put that here -- so</u>
            <u>any – in Question 9</u>. So anything that goes into Question 9
7           should be included in Question 8. All right? So if you award
            damages, the total amount that I think you're awarding is in
8           8. If anything is in 9 for tax neutralization, that should be
            part of what is already in 8. Okay? All right.
9

11 (*Id.* at 7:18-8:2 (emphasis added).)  When asked by the Jury about whether they

12 should divide the amount in Question No. 9 up into past and future, as was done in

13 Question No. 8 of the Verdict Form, the Court against reinforced that the tax

14 neutralization amount should be separately placed in Question No. 9:

16          THE COURT: So if you -- all I can tell you is if you award as
            part of your total damages any damages for tax
17          neutralization purposes, whatever amount you had
            decided for that category, if any, should go into Question
18          9.
19

20 (*Id.* at 8:15–18.)

21       The Court denies thus Plaintiff's Rule 60 Motion as the inclusion of the tax

22 neutralization amount in the total damages without including it in the other

23 subsections was not a clerical mistake.  The Jury correctly followed the instructions of

24 the Court and provided the tax neutralization amount separately in Question No. 9

25 while also including that amount in the Total Damages for Question No. 8.  Relief

26 under Rule 60(a) is thus not appropriate.

27 ////

28 ////

**OBJECTIONS TO BILL OF COSTS**

Plaintiff has filed a Bill of Costs ("BOC") to which Defendant has filed objections related to several items contained and Plaintiff has filed a Reply.  (BOC (ECF No. 241); Obj. (ECF No. 245); Reply re:BOC (ECF No. 247).)  Local Rule 292(f) and 28 U.S.C. § 1920 provide items that can be included as taxable costs.  The Court considers each of Defendant's objections to the costs sought by Plaintiff in turn.

**I.    Summons and Subpoena Fees**

Defendant objects to the portion of Plaintiff's BOC concerning the service of summons and subpoenas on four individuals, totaling $203.50, are not recoverable as "fees for expedited service or other surcharges are not."  The items contained in the relevant invoices for these four individuals are:

1. "Process Serving Area Surcharge" of $44.95 in connection with service on Anne Brewer;

2. "Process Serving Area Surcharge," "Mailing Declaration Fee," and "Process Serving Copy Charge" totaling $68.65 in connection with service on Edmund Pecinovsky;

3. "Process Serving Area Surcharge" of $24.95 in connection with service on Anne Brewer; and

4. "Process Serving Area Surcharge" of $64.95 in connection with service on POST.

(Obj. at 2; Brown Decl. ISO BOC (ECF No. 241-2) at 10, 12, 13, 17.)

Local Rule 292(f)(2) permits the taxation of costs for "fees for service by a person other than the Marshal under Fed. R. Civ. P. 4 to the extent they do not exceed the amount allowable for the same service by the Marshal . . . ."  The fee for personal service by the United States Marshal is mainly calculated using the hours necessary to execute service.  *See* 28 C.F.R. § 0.114(a)(3).  Plaintiff's explanation for these charges is that "they were imposed by One Legal, which would not have completed service without these payments" and were thus necessary.  (Reply re:BOC at 2.)  However,

36

1    neither the invoice on which these charges or based on Plaintiff's subsequent

2    explanation provides sufficient information or evidence for the Court to determine the

3    amount of time required for service to determine if these fees exceed the amount

4    allowable for the same service by the Marshal.  Accordingly, the Court will sustain

5    Defendant's objection to the inclusion of these fees in Plaintiff's costs and reduce the

6    costs by $203.50.

7    **II.    Copying and Duplication Costs**

8         **A.  Copying**

9         Defendant objects to the taxation of $828.60 in costs for copying of documents

10   performed in-house.  Section 1920(4) permits taxation of costs for "[f]ees for

11   exemplification and the costs of making copies of any materials where the copies are

12   necessarily obtained for use in the case[.]"  *See also* Local Rule 292(f)(5).  However, the

13   rule applied in many courts is that in-house copying is not a permitted cost under

14   Section 1920(4).[9]  *See Frederick v. City of Portland*, 162 F.R.D. 139, 144 (D. Or. 1995);

15   *see also Simons v. Costco Wholesale Corp.*, No. 3:18-cv-00755-SB, 2021 WL 1244309,

16   at *5 (D. Or. Feb. 22, 2021) (citing *Frederick*, 162 F.R.D. at 144.).  Given that the

17   copying costs contained in the Brown Declaration are in-house copying costs that are

18   unsupported by any documentation, the Court will sustain Defendant's objection to

19   the $828.60 in copying costs as not an allowed cost under Section 1920(4).

20        **B.  $2.50 Computer Charge and Unaccounted for Costs**

21        Plaintiff is not entitled to the cost of computer usage.  However, Plaintiff

22   represents that this amount was not included in the requested fees.  (Reply re:BOC at

23   3.)  Reviewing the BOC and supporting documentation provided to confirm this was

24   the case proved inconclusive on this point because there appears to be a tabulation

25

26   [9] Plaintiff cites *U.S. Fidelity & Guar. Co. v. Lee Investments LLC*, No. 99-cv-5583-OWW-SMS, 2010 WL
     3037500, at *10 (E.D. Cal. Aug. 2, 2010) for the proposition that recovery of in-house copying costs is
27   permissible.  However, while the court in that case granted copying costs that were conducted in-
     house, the court did not specifically address the issue of whether a party could tax costs for in-house
28   copying, instead only ruling that the copying costs were not unnecessary or excessive.  *Id.* at *13.

error within the BOC.  The Bohm Declaration in support of Plaintiff's BOC represents costs of $5,252.23 incurred for models, enlargements, and photocopies under section 1920(4).  (Bohm Decl. ISO BOC (ECF No. 241-3) ¶ 7.)  But looking at Exhibit F, which contains the documentation supporting this amount of costs for models, enlargements, and photocopies, the total amount contained in the invoices provided (not including the $2.50 computer charge) is $5,082.23.  (*Id.*, Ex. F.)  The $170.00 difference between the requested amount and the invoices is unaccounted for in the declaration or the receipts provided.  It is thus impossible for the Court to determine if the computer charge was appropriately excluded.  Given the lack of support provided for these costs, the Court reduces the costs for models, enlargement, and photocopies by an additional $170.00.

### C. Video Clips, Video Conversion, and Editing

Defendant objects to $2,585.00 in costs associated with "video clips and ISO's" and $1,645.00 in costs requested in connection with "video conversion and editing" on the basis that costs for video editing and synchronization are not permitted under section 1920(4).  It is unclear what some of these charges are from the invoices provided, however, in her reply, Plaintiff clarifies that these costs were incurred for editing "the car rental video by (a) deleting time where no witnesses appeared on screen with Plaintiff and (b) labeling each Enterprise employee by last name when each appeared on screen."  (Reply re:BOC at 3–4.)  The Ninth Circuit has instructed that editing a recorded deposition into video clips are not "exemplification" and thus the costs are not taxable.  *Kalitta Air LLC v. Cent. Tex. Airborne Sys. Inc.*, 741 F.3d 955, 959 (9th Cir. 2013).  Similarly, the court also stated that "synchronizing deposition videotapes with their transcripts, while convenient, [is] not an act of copying or exemplification and [is] not truly <u>necessary</u> for trial."  *Id.* (emphasis in original).  In doing so, the court noted that the Supreme Court adheres to "a narrow construction of the costs statute."  *Id.*  Considering Plaintiff's request for costs in this light, the Court finds that the taxation of these costs is inappropriate as they are not exemplifications

1  within the meaning of section 1920(4).  While the video in question was not a

2  deposition video, the editing, synchronization, and creation of clips serve effectively

3  the same purpose.  The Court does not deny that editing videos in this manner can be

4  a convenient and helpful tool.  But given the narrow construction of the costs statute,

5  these costs are not taxable under section 1920.

6      **D. Duplication**

7      Defendant also objects to costs incurred for duplication of videos in order to

8  burn them onto DVDs.  Plaintiff's BOC included $350.00 in such costs.  (Bohm Decl.

9  ISO BOC at 29, 31.)  In her Reply, Plaintiff explains that these are costs incurred in

10  preparing DVD exhibits for trial.  The service Plaintiff used charged $35 per DVD

11  created and ten DVDs were burned in connection with three exhibits (four DVDs each

12  for two exhibits and two for an additional exhibit).  (Reply re:BOC at 4.)  Defendant

13  states that such costs are not taxable under section 1920 but provides no citation for

14  this contention.  (*See* Obj. at 3.)  The costs for duplicating video onto DVDs for usage

15  as exhibits at trial appear to fall squarely within the costs allowed under section

16  1920(4).  This is supported by other courts which have found that the cost of burning

17  files onto discs is taxable.  *See Memory Lane, Inc. v. Classmates Int'l, Inc.*, No. 11-cv-

18  00940-JLS-RNBx, 2014 WL 12617383, at *2 (C.D. Cal. July 24, 2014).  Defendant also

19  argues that these costs are unreasonable, but the explanation provided by Plaintiff in

20  their Reply and discussed above shows that these costs are reasonable and not

21  excessive.  Thus, Defendant's objection to these costs is overruled.

22      **E.  Administrative Costs**

23      Plaintiff also objects to $165.50 in costs associated with parking at trial and

24  meeting with the Court's IT department in preparation for trial.  These are not costs

25  ////

26  ////

27  ////

28  ////

1  contemplated by any portion of section 1920.  Defendant's objection is sustained as

2  to these costs, and they shall be removed from the taxed costs.[10]

3  **III.    Skip Tracing Costs**

4        While not included in the BOC, Plaintiff seeks an additional $200.00 in costs for

5  locating witnesses.  Such costs are not taxable under section 1920 or the Local Rules.

6  As such, Plaintiff's request to add an additional $200.00 in costs for skip tracing is

7  denied.

8  **IV.    Trial Transcripts**

9        Finally, Defendant requests that the Court not permit costs to be taxed for

10  expedited and daily (a.k.a. real-time) trial transcripts.  Section 1920(2) permits a

11  prevailing party to tax costs for "[f]ees for printed or electronically recorded transcripts

12  necessarily obtained for use in the case[.]"  District courts have recognized that the

13  cost of daily trial transcripts is not recoverable unless there is a special need for daily

14  transcripts or prior court approval is obtained.  *See Stimmell v. Morales*, No. 12-cv-

15  00155-LJO-BAM, 2013 WL 6174684, at *1 (E.D. Cal. Nov. 21, 2013); *see also Dowd v.*

16  *City of Los Angeles*, 28 F. Supp. 3d 1019, 1049 (C.D. Cal. May 23, 2014) (noting that

17  "daily trial transcript costs should not be awarded absent court approval prior to the

18  trial" but awarding them as the Court had required parties to cite specific pieces of

19  testimony to make evidentiary objections and argue proposed jury instructions).

20  Here, there is no evidence that daily trial transcripts were anything more than a

21  convenience to the attorneys and prior court approval was not obtained for daily

22  transcripts.  Accordingly, the Court will grant Defendant's objection as to Plaintiff's

23  request for daily/real-time trial transcripts and reduce the costs taxed by $3,416.90 to

24  account for the removal of those costs.

25  _____

26  [10] Plaintiff suggests that a portion of these administrative costs ($30.50) was not included in the requested costs but as discussed above.  (Reply re:BOC at 5.)  However, the requested costs under section 1920(4) were greater than the total of all invoices provided in Exhibit F, including the $30.50

27  identified by the Plaintiff as not included.  *See supra* Objections to Bill of Costs II.B.  Thus, a reduction is warranted as either these costs were in fact included in the requested costs but were not taxable under

28  section 1920 or the requested amount contained costs for which there was no support provided.

1   For the same reason, the Court also sustains Defendant's objection to Plaintiff's

2   request for costs in connection with expedited transcripts.  However, while the Court

3   denies costs for those transcripts being provided in an expedited manner, section

4   1920(2) does permit the taxation of trial transcripts.  Accordingly, as to the expedited

5   transcripts requested, the Court instead reduces those costs to the non-expedited 14-

6   day rate.[11]  Plaintiff's expedited trial transcripts were 710 pages and, utilizing the rate

7   for the other non-expedited transcripts of $4.70 a page, the Court will permit costs of

8   $3,337.00 to be taxed for those transcripts which is a reduction of $768.95 of the

9   requested costs.

10  **V.    Total Cost Reduction**

11      In sum, the Court reduces Plaintiff's taxed costs, as stated in the BOC, by

12  $9,783.45.  Defendant shall be taxed costs of $22,944.77.

13                                    **CONCLUSION**

14      For the reasons stated, it is hereby ordered that:

15  1.  Defendant's Renewed Motion for Judgment as a Matter of Law under

16      Federal Rule of Civil Procedure Rule 50(b) (ECF No. 248) is DENIED;

17  2.  Defendant's Motion for New Trial under Federal Rule of Civil Procedure 59

18      (ECF No. 249) is DENIED IN PART and CONDITIONALLY DENIED IN PART

19      based on Plaintiff accepting a remittitur of $1,111,913 in future economic

20      damages.

21  3.  Within thirty (30) days of this order, Plaintiff shall file a stating whether she

22      accepts or rejects the remittitur.  Depending on Plaintiff's decision, the Court

23      will either order a new trial on future economic damages or enter an order

24      denying Defendant's Motion and an amended judgment.

25  4.  Defendant's Motion to Correct the Verdict Form under Federal Rule of Civil

26      Procedure 60 (ECF No. 249) is DENIED;

27

28  [11] The Court here uses Defendant's definition of expedited as "a turnaround of less than 14 days".  (Obj.
    at 4 n.2.)

5. Defendant's Objections to Plaintiff's Bill of Costs are SUSTAINED IN PART and OVERRULED IN PART as stated above.  Defendant shall be taxed costs of $22,944.77.

IT IS SO ORDERED.

Dated:   **April 17, 2025**

Hon. Daniel J. Calabretta
UNITED STATES DISTRICT JUDGE

DJC1 – evans15cv01951.50+59

42