Lawrance A. Bohm (SBN: 208716)
lbohm@bohmlaw.com
Kelsey K. Ciarimboli (SBN: 302611)
kciarimboli@bohmlaw.com
Andrew L. Thrasher (SBN: 346124)
athrasher@bohmlaw.com
Jack C. Brouwer (SBN: 353351)
jbrouwer@bohmlaw.com
**BOHM LAW GROUP, INC.**
4600 Northgate Blvd., Ste. 210
Sacramento, California 95834
Telephone:  866.920.1292
Facsimile:   916.927.2046
Email:        BLG001021@bohmlaw.com

Scott A. Brown (SBN: 177099)
sbrown@bplegalgroup.com
**BROWN | POORE LLP**
2950 Buskirk Avenue, Suite 330
Walnut Creek, California 94597
Telephone: 925.943.1166
Facsimile: 925.955.8600

Attorneys for Plaintiff,
TAMARA EVANS

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TAMARA EVANS,<br><br>        Plaintiff,<br><br>    v.<br><br>CALIFORNIA COMMISSION ON PEACE OFFICERS STANDARDS AND TRAINING; EDMUND PECINOVSKY; ANNE BREWER and DOES 1-25, inclusive,<br><br>        Defendant. | Case No.: 2:15-cv-01951-DJC-SCR<br><br>**PLAINTIFF'S NOTICE OF SUPPLEMENTAL AUTHORITY IN SUPPORT OF MOTION FOR ATTORNEYS' FEES AND COSTS**<br><br>*Hon. Daniel J. Calabretta, Courtroom 7*<br><br>Action Filed:    June 4, 2014<br>Trial Date:       September 3, 2024 |

1

**Plaintiff's Notice of Supplemental Authority**                                      BOHM LAW GROUP, INC.
*Evans v. CA Commission on Peace Officers Standards & Training, et al.*      BROWN | POORE LLP
Case No.: 2:15-cv-01951-DJC-SCR

BOHM LAW GROUP, INC.
4600 NORTHGATE BOULEVARD, SUITE 210
SACRAMENTO, CALIFORNIA 95834

**TO THE COURT, ALL PARTIES, AND THEIR RESPECTIVE COUNSEL OF RECORD:**

Plaintiff Tamara Evans hereby respectfully submits the following supplemental authority in support of her Motion for Attorneys' Fees and Costs:

During the pendency of the motion, on February 24, 2026, the Ninth Circuit Court of Appeals decided *LA International Corp. v. Prestige Brands Holding*, 2025 U.S. App.LEXIS 5422 (9th Cir. Feb. 24, 2026), which is relevant to the disposition of this motion. The opinion is attached hereto is **Exhibit A**. This opinion supports Plaintiff's argument in her Reply Memorandum, Section B(5) that the size of Plaintiff's counsel's law firms have no impact on their rates.

Date: March 5, 2026                                    By:    */s/ Kelsey K. Ciarimboli*
                                                              LAWRANCE A. BOHM, ESQ.
                                                              KELSEY K. CIARIMBOLI, ESQ.
                                                              ANDREW L. THRASHER, ESQ.
                                                              JACK C. BROUWER, ESQ.
                                                              SCOTT A. BROWN, ESQ.

                                                              Attorneys for Plaintiff,
                                                              TAMARA EVANS

BOHM LAW GROUP, INC.
4600 NORTHGATE BOULEVARD, SUITE 210
SACRAMENTO, CALIFORNIA 95834

2

**Plaintiff's Notice of Supplemental Authority**                          BOHM LAW GROUP, INC.
*Evans v. CA Commission on Peace Officers Standards & Training, et al.*        BROWN | POORE LLP
Case No.: 2:15-cv-01951-DJC-SCR

# EXHIBIT A

2026 WL 504763
Only the Westlaw citation is currently available.
United States Court of Appeals, Ninth Circuit.

LA INTERNATIONAL CORP.; Manhattan Wholesalers, Inc.; Excel Wholesale Distributors,
Inc.; Valve Distributor, Inc.; AKR Corporation; U.S. Wholesale Outlet & Distribution, Inc.;
Sanoor, Inc., Doing Business as L.A. Top Distributor; Pittsburg Wholesale Grocers, Inc.;
Pacific Groservice, Inc.; Border Cash & Carry, Inc., Plaintiffs – Appellees / Cross – Appellants,
v.
PRESTIGE BRANDS HOLDINGS, INC.; Medtech Products, Inc., Defendants – Appellants / Cross – Appellees.

No. 24-3776, No. 24-5009, No. 24-5227
|
Filed February 24, 2026
|
Argued and Submitted July 15, 2025 Pasadena, California

Appeal from the United States District Court for the Central District of California, Michael W. Fitzgerald, District Judge, Presiding, D.C. No. 2:18-cv-06809-MWF-MRW

**Attorneys and Law Firms**

Mark Poe (argued), Victor Meng, and Randolph Gaw, Gaw Poe LLP, San Francisco, California, for Plaintiffs-Appellees.

Michael L. Fox (argued), C. Sean Patterson, and Christine C. Ross, Duane Morris LLP, San Francisco, California; Robert Kum, Duane Morris LLP, Los Angeles, California; Robert M. Palumbos and William Shotzbarger, Duane Morris LLP, Philadelphia, Pennsylvania; for Defendants-Appellants.

Before: Kim McLane Wardlaw, Salvador Mendoza, Jr., and Anthony D. Johnstone, Circuit Judges.

## OPINION

MENDOZA, Circuit Judge:

When the country was in the throes of the Great Depression, Congress grew concerned that large grocery chains could use their immense purchasing power to demand and receive special pricing and allowances from suppliers. Katherine Van Dyck, *Price Discrimination and Power Buyers: Why Giant Retailers Dominate the Economy and How to Stop It*, 53 U. Balt. L. Rev. 297, 299–301 (2024). Fearing that this advantage would enable chains to drive smaller, independent shops out of business, Congress amended Section 2 of the Clayton Act with the Robinson-Patman Act ("RPA"), 15 U.S.C. §§ 13–13b, 21a, to combat the "evil that a large buyer could secure a competitive advantage over a small buyer solely because of the large buyer's quantity purchasing ability." *FTC v. Morton Salt Co.*, 334 U.S. 37, 43, 68 S.Ct. 822, 92 L.Ed. 1196 (1948). Therefore, Congress decided to help the little guys have a fighting chance by awarding reasonable fees to attorneys who help small shops prevail over Goliaths on RPA claims. 15 U.S.C. § 15(a).

**\*2** In this case, a jury returned a verdict finding that the manufacturer of Clear Eyes Redness Relief Eye Drops had discriminated against ten wholesale purchasers by providing discounts to larger buyers in violation of Section 2 and California's Unfair Practices Act ("UPA") and Unfair Competition Law ("UCL"). 15 U.S.C. §§ 13(a), (d); Cal. Bus. & Prof. Code §§ 17045, 17200. The district court issued a permanent injunction and awarded damages and attorney's fees to Plaintiffs, whose lawyers hail from a small firm that specializes in bringing RPA claims to curtail price discrimination.

On appeal, Defendants challenge several jury instructions. They say the district court's instructions mischaracterized one of their defense theories, that payments discriminatorily offered to Costco but not to Wholesalers were "functional discounts." Next, they say the district court got the law wrong when it did not require jurors to find that price discrimination caused substantial harm to Wholesalers. Finally, they say the district court should have required jurors to make an explicit finding that Wholesalers were competing with giants for the same dollar. Defendants also challenge the district court's calculation of the net price purchasers paid the manufacturer for eye drops and issuance of a permanent injunction. In their cross-appeal, Plaintiffs challenge only the district court's award of attorney's fees. They argue that, when the district court calculated Plaintiffs' attorney's fees, it erred by diminishing the rate they were due based on the small size of their firm.

We affirm the district court with respect to Defendants' claims. We vacate the district court's award of attorney's fees and remand with instructions to enter a new fee award consistent with this opinion.

## I.

### A.

Defendants Prestige Consumer Healthcare, Inc. and its subsidiary Medtech Products, Inc. (together, "Prestige") manufacture Clear Eyes Redness Relief eye drops. Prestige does not distribute Clear Eyes directly to retail outlets but instead sells to wholesalers for distribution. Plaintiffs are ten such wholesale businesses (together, "Wholesalers") that purchased Clear Eyes from Prestige for resale to retailers like convenience stores, gas stations, and liquor stores. Wholesalers allege that Prestige sold Clear Eyes at an impermissibly lower price to their larger competitors, namely, Costco Wholesale Corporation and the Sam's Club division of Walmart, Inc.

For many years Prestige has charged Wholesalers a higher invoice price for Clear Eyes than it charges to Costco and Sam's Club because, according to Prestige, these larger purchasers are eligible for deductions that Wholesalers are not. [1] In typical years, Costco's annual price advantage was around 5%, which allowed Costco to offer 12-packs of Clear Eyes to consumers at a net price of $1.00 to $2.00 less than Wholesalers could.

On top of this 5% price differential, Prestige offered Costco customers instant rebate coupons of $3.00 per 12-pack during select business savings events that happened two to four times a year. These rebates were given directly to Costco customers, deducted from the sale price they paid at the register, rather than to Costco. Even so, the rebates allowed Costco to take a larger margin on sales than Wholesalers could. In 2016, Prestige sold boxes of Clear Eyes to Costco for $14.04, which Costco then sold to customers for $14.99—a $0.95 markup—although the price customers actually paid at the register was only $11.99 after the $3.00 rebate. By contrast, in the same period, Prestige sold Clear Eyes to Wholesalers for $14.76 per box. At this price, if Wholesalers were to match Costco's post-rebate price of $11.99, they would lose $2.77 on every sale. And Prestige did not offer a similar rebate program to Wholesalers.

**\*3** Prestige also participated in Costco's "delivery, operations, and web services" ("DOW") program. Under the DOW program, Prestige made quarterly payments to Costco—in the amount of 3.95% of Costco's acquisition cost for Clear Eyes—to secure Costco's advertising and promotional services. At the same time, Prestige did not offer to pay any Wholesalers for advertising and promotional services like the DOW remittance.

### B.

Wholesalers brought this action under the Robinson-Patman Act ("RPA"), which "prohibits sellers of goods from discriminating among competing buyers in certain circumstances," *U.S. Wholesale Outlet & Distrib., Inc. v. Innovation Ventures, LLC*, 89 F.4th 1126, 1134 (9th Cir. 2023), and California's UPA and UCL, 15 U.S.C. §§ 13(a), (d); Cal. Bus. & Prof. Code §§ 17045, 17200.

Wholesalers sought relief under Section 2(a) of the RPA, which "bars a seller from discriminating in price between competing purchasers of commodities of like grade and quality." *U.S. Wholesale*, 89 F.4th at 1134 (citing 15 U.S.C. § 13(a)). One form of discrimination under this section is secondary-line price discrimination, which occurs when "a seller gives one purchaser a more favorable price than another." *Id.* (quoting *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1187 (9th Cir. 2016)). To establish secondary-line discrimination, "a plaintiff must show that (1) the challenged sales were made in interstate commerce; (2) the items sold were of like grade and quality; (3) the seller discriminated in price between the disfavored and the favored buyer; and (4) the effect of such discrimination may be [substantially to lessen competition or tend to create a monopoly in any line of commerce, or] to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination." *Id.* (internal quotation marks and citation omitted); 15 U.S.C. § 13(a).

A plaintiff may establish the fourth element by showing either a "diversion of sales or profits from a disfavored purchaser to a favored purchaser," or "that a favored competitor received a significant price reduction over a substantial period of time." *Volvo Trucks N. Am. v. Reeder-Simco GMC, Inc.*, 546 U.S. 164, 177, 126 S.Ct. 860, 163 L.Ed.2d 663 (2006) (citation omitted).

Prestige mounted several defenses, arguing that (1) Wholesalers and Costco were not competing purchasers; (2) any price differential reflects Prestige's savings from the "differing methods" by which Clear Eyes was packaged and delivered; (3) Section 2(a) requires Wholesalers to show *substantial* harm to competition, which is absent here; and (4) payments to Costco were justifiable "functional discounts," which do not violate the RPA under *Texaco Inc. v. Hasbrouck*, 496 U.S. 543, 571, 110 S.Ct. 2535, 110 L.Ed.2d 492 (1990).

A functional discount is a "reasonable" reimbursement to compensate a purchaser for "its role in the supplier's distributive system, reflecting, at least in a generalized sense, the services performed by the purchaser for the supplier." *Hasbrouck*, 496 U.S. at 554 n.11, 110 S.Ct. 2535. To qualify as a functional discount, a buyer must "*actually* perform[ ] certain functions, assuming all the risk, investment, and costs involved." *Id.* at 560, 110 S.Ct. 2535 (emphasis in original). The doctrine does not "countenance a functional discount completely untethered to either the supplier's savings or the wholesaler's costs." *Id.* at 563, 110 S.Ct. 2535.

Wholesalers also sought injunctive relief under Section 2(d), which "makes it unlawful for a manufacturer to discriminate in favor of one purchaser by making payments to that purchaser 'in connection with the sale, or offering of any products unless such payment or consideration is available on proportionally equal terms to all other customers competing in the distribution of such products.' " *U.S. Wholesale*, 89 F.4th at 1134 (quoting 15 U.S.C. § 13(d)) (citation modified). To prevail on such a claim, a plaintiff "must establish that it is in competition with the favored buyer and 'must show a threat of antitrust injury.' " *Id.* (quoting *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 122, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986)).

**\*4** Wholesalers additionally sought damages under the UPA and UCL. The UPA prohibits

> [t]he secret payment or allowance of rebates, refunds, commissions, or unearned discounts, whether in the form of money or otherwise, or secretly extending to certain purchasers special services or privileges not extended to all purchasers purchasing upon like terms and conditions, to the injury of a competitor and where such payment or allowance tends to destroy competition.

Cal. Bus. & Prof. Code § 17045.

The UCL prohibits "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising," and would be triggered by violations of the RPA or UPA. Cal. Bus. & Prof. Code § 17200.

### C.

The case proceeded to trial. The jury returned a verdict in favor of Wholesalers on their Section 2(a) claims and awarded damages in varying amounts to all Wholesalers except Border Cash & Carry, which the jury determined was too far from any Costco locations to be in direct competition with them.[2] The jury also found in favor of the five California-based Wholesalers on their UPA claims and the district court concluded that Prestige violated the UCL.

The district court entered judgment for Wholesalers, awarding damages and granting a permanent injunction. Wholesalers then sought $7,651,766.80 in attorney's fees. Calculating hourly rates lower than those proposed by Wholesalers but higher than those put forward by Prestige, the district court awarded $3,142,268.45 in attorney's fees.

On appeal, Prestige challenges (1) the district court's jury instructions, (2) calculation of net price, (3) issuance of a permanent injunction, and (4) award of attorney's fees. Wholesalers challenge only the district court's award of attorney's fees.

### II.

We begin by considering Prestige's three challenges to the jury instructions. Prestige asserts that the district court: first, did not correctly present Prestige's functional discount defense to the jury; second, erroneously declined to instruct the jury that Wholesalers needed to demonstrate substantial harm to competition; and third, wrongly rejected Prestige's request for an instruction that the jury must find that Wholesalers competed with Costco for the same dollar. We review errors in the formulation of a jury instruction for abuse of discretion and review an instruction's misstatement of the law de novo. *Hunter v. County of Sacramento*, 652 F.3d 1225, 1232 (9th Cir. 2011).

### A.

We start with Prestige's first challenge, that the district court did not correctly present the functional discount defense to the jury. Prestige contends that the district court made three specific errors in its presentation. First, that the jury instructions did not make it clear that, if the jury were to find that payments made to Costco were functional discounts, then those payments necessarily did not violate Section 2; second, that the district court abused its discretion by failing to require jurors to answer on a special verdict form whether they found that Prestige's payments were functional discounts; and third, that the district court's response to a question from the jury compounded the jurors' possible confusion about functional discounts.

### i.

**\*5** It was paramount to Prestige's defense that the jury understood that a finding that Prestige's payments to Costco were functional discounts would necessarily mean that those payments did not violate Section 2. To convey this, Prestige proposed the following instructions:

> Plaintiff bears the ultimate burden to prove that Defendants' lower prices were not justified as a functional discount. If you find that the lower prices granted by Defendants to Costco Wholesale Corporation,

Sam's Club and Select Corporation were justified as a functional discount, then you must return a verdict for Defendants on the Robinson-Patman Act claim. If you find that the prices to the Costco Wholesale Corporation, Sam's Club and Select Corporation were not justified as a functional discount, then you must consider the remainder of the court's instructions before reaching your verdict.

The district court instead instructed the jury with this formulation:

The Plaintiffs bear the ultimate burden to prove that the Defendants' lower prices were not justified as a functional discount. If you find that the differences in prices here were functional discounts, then any discriminatory pricing did not have a reasonable possibility of harming competition.

Prestige contends that the last sentence in the district court's instruction suggested to the jury that "functional discount" is merely a "concept" for them to consider rather than a complete defense to a Section 2(a) claim. So, Prestige argues, the district court misstated the law in its jury instruction. We disagree.

While the district court did not use Prestige's preferred formulation to explain to the jury the legal consequences of their finding on functional discounts, the district court crafted an instruction that achieved Prestige's desired effect. The district court correctly instructed the jury that it was required to find for Prestige if any element of Section 2(a) was not met. The district court also instructed the jury that, if "differences in prices here were functional discounts, then any discriminatory pricing did not have a reasonable possibility of harming competition." 15 U.S.C. § 13(a). Because harm to competition is an element of Section 2(a), it was clear to the jury that, if they believed the price differences were functional discounts, then an element of Section 2(a) was not met.

In *U.S. Wholesale*, we endorsed this syllogism, explaining that finding a payment is a functional discount "negates the probability of competitive injury, an element of a prima facie case of violation." 89 F.4th at 1139 (quoting *Hasbrouck*, 496 U.S. at 561 n.18, 110 S.Ct. 2535). In the present case, the jury instructions made it clear that, if Wholesalers failed to prove that price differences were not justified as functional discounts, then Wholesalers had also failed to prove harm to competition, and their Section 2(a) claims must consequently fail. Therefore, the district court's instructions did not misstate the law.

**ii.**

Prestige proposed that the district court require the jury to complete a one-hundred-forty-seven-page novella, disguised as a special verdict form. On appeal, Prestige contends that the district court abused its discretion by having the jury complete a shorter, seven-page verdict form that did not require the jury to specifically state its finding on the functional discount defense.

**\*6** District courts have "broad discretion in deciding whether to send the case to the jury for a special or general verdict." *United States v. Real Prop. Located at 20832 Big Rock Drive, Malibu, Cal. 902655*, 51 F.3d 1402, 1408 (9th Cir. 1995); *see also Floyd v. Laws*, 929 F.2d 1390, 1395 (9th Cir. 1991) ("As a general rule, the court has complete discretion over whether to have the jury return a special verdict or a general verdict."). "[T]his discretion extends to determining the form of the special verdict, provided the questions asked are adequate to obtain a jury determination of the factual issues essential to judgment." *Mateyko v. Felix*, 924 F.2d 824, 827 (9th Cir. 1990).

Here, the district court included separate questions for each claim of liability, causation, and the affirmative defenses but declined to include separate questions for each element of Wholesalers' claims or Prestige's affirmative defenses. By crafting the special

verdict form in this way, the district court summarized the law in a manageable and comprehensible manner and tried to avoid creating a special verdict form "spanning 147 pages and 369 questions," like the special verdict form that Prestige proposed. The question before us is whether the special verdict form, "when considered with the instruction as a whole, fully and fairly presented to the jury the issues it was called upon to decide." *Mateyko*, 924 F.2d at 827. We hold that it did.

The judge opted for a straight line instead of taking Prestige's scenic route, which would have both wasted jurors' time and risked them missing the forest for the trees. The key is to view the instructions together, rather than as fragments. Viewing the district court's instructions as a whole, we see that they fully and fairly presented the complicated issues in this case to the jury.

### iii.

As is common with complicated issues, during deliberations, the jury submitted a question to the district court: "Regarding Instruction Number 17, page 19, lines 9 through 20, does the jury have to be in unanimous agreement on each point and subpoint?"

Instruction Number 17 outlined the elements of Wholesalers' Section 2(a) claim. The instructions for the third element (on lines 13 to 16) said:

> 3. there is a reasonable possibility that the discriminatory pricing may harm competition. This element includes the concepts of (a) actual competition (Instruction No. 20); (b) competitive injury (Instruction Nos. 21–22); and (c) functional discounts (Instruction No. 23).

The district court concluded that the jury's mention of "subpoint[s]" must have referred to the three concepts within element three. Outside the presence of the jury, the district court and the parties agreed that the jury must unanimously find all three elements were met. The district court reminded the jury that "there must be unanimous agreement on each of the three elements."

Prestige argues that the district court "acknowledged" that the jury's question "likely resulted from confusion on how to apply the question of functional discounts." It then argues that the district court's supplemental instruction in response to the question misled the jury because it implied that, even if the jury found that price differences were functional discounts, such a finding would not mandate a verdict for Prestige.

But the district court did not give the jury license to ignore the subparts of element three. To the contrary, the district court clarified that the jury was to consider each subpart "in answering the ultimate question of" whether element three has been proven. In response to the jurors' question, the district court instructed that "to prove liability, [the jury] must unanimously agree that those three elements have been met.... If [they] unanimously agree that those three elements are met, all three elements are met, then there is liability." The court added that, "as to the subpoints, ... that is how the law [ ] defin[es] that third element. So that is why I refer to them as concepts instead of elements.... [T]hose instructions are to explain the law to you, so you can determine whether Element 3 has been proven by the plaintiffs or not."

**\*7** We find that the district court's supplemental instruction did not suggest to the jury that it could return a verdict for Wholesalers if the payments were functional discounts. Rather, the supplemental instruction correctly clarified that, if Prestige's payments were functional discounts, that would "negate[ ] the probability of competitive injury" and thus require the jury to find that Wholesalers failed to establish an element of their Section 2(a) claim. *U.S. Wholesale*, 89 F.4th at 1139.

**B.**

Prestige next argues that the district court erred by failing to instruct the jury that Wholesalers needed to demonstrate *substantial* harm to competition to demonstrate a Section 2(a) violation. We disagree. A showing of substantial harm is not required to establish competitive injury.

Section 2(a) provides in relevant part:

> It shall be unlawful for any person ... to discriminate in price between different purchasers of commodities ... where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them.

15 U.S.C. § 13(a).

Before trial, Prestige contended that the jury instructions should require Wholesalers to establish "substantial harm to competition" rather than "harm to competition" because the word "substantially" in 15 U.S.C. § 13(a) modifies the phrase "to injure, destroy, or prevent competition." Disagreeing, the district court denied this request and drew on the formulation from the American Bar Association Model Jury Instructions in Civil Antitrust Cases, which requires the plaintiff to establish "a reasonable possibility of harm to competition." ABA Model Instructions, Robinson-Patman Act, Seller Liability—Section 2(a), Instruction No. 10, Competitive Injury.

Interpreting Section 2(a), we hold that the district court correctly excluded "substantial" from the jury instructions because "substantially" does not modify the phrase "to injure, destroy, or prevent competition." 15 U.S.C. § 13(a). Congress strung together the clauses in Section 2(a) with the disjunctive "or," which requires that we treat the clauses separately. *United States v. Nishiie*, 996 F.3d 1013, 1023 (9th Cir. 2021) ("As a general rule, the use of a disjunctive in a statute indicates alternatives and requires that they be treated separately." (internal quotation marks and citation omitted)). Thus, "substantially" modifies "to lessen competition" but does not modify "tend to create a monopoly" or "to injure, destroy, or prevent competition."

"Canons of construction ordinarily suggest that terms connected by a disjunctive be given separate meanings, unless the context dictates otherwise." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979). Here, context supports giving the clauses separate meanings because it would make little sense to say, "substantially tend to create a monopoly," as Prestige's proposed reading would have us do. And, prior to the amendment of the Clayton Act by the RPA, courts did not read "substantially" as modifying "tend to create a monopoly." *See George Van Camp & Sons Co. v. Am. Can Co.*, 278 U.S. 245, 253, 49 S.Ct. 112, 73 L.Ed. 311 (1929) ("The effect of the discrimination is to substantially lessen competition, and its tendency is to create a monopoly."); *Lipson v. Socony Vacuum Corp.*, 76 F.2d 213, 216 (1st Cir. 1935) (asking whether the discrimination "may substantially lessen competition in interstate commerce, or which tends to create a monopoly"); *Sidney Morris & Co. v. Nat'l Ass'n of Stationers, Off. Outfitters & Mfr's*, 40 F.2d 620, 625 (7th Cir. 1930) ("If the effect of such discrimination is to substantially lessen competition, there is no necessity for plaintiff to establish the alternative, to wit, that the effect tended to create a monopoly.").

**\*8** A disjunctive reading also accords with our precedents interpreting the RPA. Although we have never before squarely addressed the question at issue in this case, in *Hasbrouck v. Texaco, Inc.* we stated that "[t]he Supreme Court has interpreted this portion of the statute as requiring an antitrust plaintiff to show only 'a reasonable possibility that a price differential may harm competition.' " 842 F.2d 1034, 1041 (9th Cir. 1987) *aff'd*, 496 U.S. 543, 110 S.Ct. 2535, 110 L.Ed.2d 492 (1990) (quoting *Falls*

*City Indus., Inc. v. Vanco Beverage, Inc.*, 460 U.S. 428, 434–35, 103 S.Ct. 1282, 75 L.Ed.2d 174 (1983)). In *U.S. Wholesale*, we listed the requirements of secondary-line discrimination and did not include the word "substantial." 89 F.4th at 1134. Likewise, as the district court discussed, the Supreme Court in *Volvo* "omitted the word 'substantially' when recounting the elements for secondary-line injury, requiring that a plaintiff need only show that 'the effect of [the price] discrimination may be to injure, destroy, or prevent competition' to the advantage of the favored purchaser." *Volvo*, 546 U.S. at 176, 126 S.Ct. 860 (internal quotation marks and citation omitted).

Moreover, this reading fits with our previous inquiries into the legislative history of the RPA, where we noted that the purpose of adding the "injure, destroy, or prevent" passage was "to relieve secondary-line plaintiffs—small retailers who are disfavored by discriminating suppliers—from having to prove harm to competition marketwide, allowing them instead to impose liability simply by proving effects to individual competitors." *Rebel Oil Co., Inc. v. Atl. Richfield, Co.*, 51 F.3d 1421, 1446 n.18 (9th Cir. 1995). Both the House and Senate Reports from the passage of the RPA explained that the amendment was necessary because the Clayton Act's standard of "substantially to lessen competition" had been "too restrictive, in requiring a showing of general injury to competitive conditions." S.Rep. No. 1502, 74th Cong., 2d Sess. 4 (1936); H.R. Report No. 2287, 74th Cong., 2d Sess. 8 (1936); *see Rebel Oil*, 51 F.3d at 1446 n.18. The Senate Report explained that the innovation of the RPA was to protect "the competitor victimized by the discrimination," based on Congress's belief that doing so would help "catch the weed in the seed [to] keep it from coming to flower." S.Rep. No. 1502, 74th Cong., 2d Sess. 4 (1936). In other words, one of the RPA's purposes is to address competitor harms before they become widespread.

Given this statutory history and context, which fits together with our construction of Section 2(a)'s disjunctive text, we have no trouble concluding that Wholesalers needed to show only that the effects of Prestige's discriminatory actions "may be ... to injure, destroy, or prevent competition." 15 U.S.C. § 13(a). So the district court did not err when it instructed the jury that the plaintiff was required to establish "a reasonable possibility of harm to competition."

### C.

Finally, Prestige argues that the district court erred by rejecting Prestige's request for an instruction that the jury must find that Wholesalers were competing with Costco for "the same dollar." The district court understood Costco and Sam's Club as fitting within the typical chain store paradigm presented in *U.S. Wholesale* and, consequently, determined that such an instruction was unnecessary in this case. Prestige, however, argues that because these chains require memberships, they serve a different market than Wholesalers.

Prestige urges us to apply a different paradigm to this case, drawn from *Volvo*. There, Volvo dealers resold trucks through a competitive bidding process, where a retail customer would describe "its specific product requirements and invite[ ] bids from several dealers it selects." *Volvo*, 546 U.S. at 170, 126 S.Ct. 860. Once a retail customer requested a bid, the Volvo dealer would then go to Volvo and request a discount or concession off the wholesale price. *Id.* Volvo would decide on a case-by-case basis whether to offer a discount and at what rate. *Id.* The Volvo dealer would then "use[ ] the discount offered by Volvo in preparing its bid," and would only purchase from Volvo if the retail customer accepted its bid. *Id.* at 170–71, 126 S.Ct. 860. Retail customers rarely solicited bids from more than one Volvo dealer. *Id.* at 171, 126 S.Ct. 860.

*9 The Supreme Court concluded that the plaintiff offered insufficient evidence to permit an inference that any dealer or group of dealers was "favored," where the plaintiff largely relied on comparisons between its competition with non-Volvo dealers and other Volvo dealers' competition with the entirely separate non-Volvo dealers. *Volvo*, 546 U.S. at 178, 126 S.Ct. 860. The Court reasoned that a bidding process, in which retail customers narrowed the relevant market by choosing the particular dealers from which they would solicit bids, is not "comparable to a chainstore or a large independent department store." *Id.*

The Ninth Circuit considered *Volvo* when it decided *U.S. Wholesale.* In that case, a set of wholesalers alleged that the producer of 5-hour Energy offered Costco Business Centers more favorable pricing, discounts, and reimbursements than it offered the other

wholesalers. *U.S. Wholesale,* 89 F.4th at 1133. Relying on *Volvo,* the district court concluded that the wholesalers and Costco were not in actual competition because they competed for different customers. *Id.* at 1136. On appeal, we reversed the district court decision and concluded that *Volvo* was inapplicable. We explained that "*Volvo* tells us that there may be circumstances where the evidence shows that each customer is selling to a 'separate and discrete' buyer ... eliminating the possibility of competition between customers." *Id.* at 1147. But we concluded that "this case is a typical chainstore-paradigm case where the Wholesalers and Costco carried and resold an inventory of 5-hour Energy to all comers." *Id.*

We reiterated that:

> to establish that two customers are in general competition, it is sufficient to prove that: (1) one customer has outlets in geographical proximity to those of the other; (2) the two customers purchased goods of the same grade and quality from the seller within approximately the same period of time; and (3) the two customers are operating on a particular functional level such as wholesaling or retailing.

*U.S. Wholesale,* 89 F.4th at 1142 (internal quotation marks and citation omitted).

Prior to trial in this case, the district court held that *Volvo* was inapplicable and declined to provide Prestige's requested instruction on actual competition. It instead instructed the jury on the elements outlined in *U.S. Wholesale.*

Prestige argues that the district court erred because *Volvo* is applicable to this case. It asserts that the district court failed to consider an important distinguishing fact: "the members of Costco and Sam's Club pay those purchasers a membership fee to go out and secure the best price for the goods the members are interested in purchasing." For that reason, Prestige says, "Costco and Sam's Club act like unique buyers and therefore do not fit within the 'typical chainstore-paradigm' as contemplated in *U.S. Wholesale.*" Rather, Prestige contends, a club member of Costco and Sam's Club "is much more akin to the model considered by the Supreme Court in *Volvo,* where a retail buyer would engage a dealer to go out and get that buyer the best price on the vehicle from the manufacturer."

In response, Wholesalers assert that this case "would only be like *Volvo* if there were evidence that Costco's customers first submitted a bid to Costco for Clear Eyes, and then Costco turned around and petitioned Prestige for discounts to fulfill each such bid as it came in." But, unlike in *Volvo,* here, "Costco bought Clear Eyes for its sales inventory, and sold it to all comers."

When the dust settles, Wholesalers' arguments are more persuasive. In *Volvo,* the retail customer chose to solicit bids from specific dealers and, through this bidding process, "the relevant market [became] limited to the needs and demands of a particular end user, with only a handful of dealers competing for the ultimate sale." *Volvo,* 546 U.S. at 179, 126 S.Ct. 860 (quoting *Reeder-Simco GMC, Inc. v. Volvo GM Heavy Truck Corp.,* 374 F.3d 701, 719 (8th Cir. 2004), *rev'd and remanded sub nom.*). Here, by contrast, there was no narrowing of the market as in *Volvo.* Costco members do pay membership fees, but they are still free to purchase goods elsewhere—and, indeed, Wholesalers produced evidence that some of its customers were also members of Costco.

 **\*10** Similarly, although Sam's Club members expressed interest in Clear Eyes and indicated what price they would be willing to pay for the product, they were not soliciting bids or narrowing the market to a select few wholesalers. "[T]his case is a typical chainstore-paradigm case," like *U.S. Wholesale,* where Wholesalers and Costco both "carried and resold an inventory of [a product] to all comers." 89 F.4th at 1147. Because *Volvo* is inapplicable, the district court did not err by instructing the jury on the factors to determine actual competition as laid out in *U.S. Wholesale.*

## III.

Prestige challenges the district court's summary judgment ruling that Costco's $3.00 instant rebate on 12-packs of Clear Eyes must be included in the Section 2(a) damages calculation. The district court further excluded "evidence or argument that the rebates did not affect the net price paid by [Costco, and] that they are not discounts." We review a district court's ruling at summary judgment de novo. *Zetwick v. County of Yolo*, 850 F.3d 436, 440 (9th Cir. 2017).

We agree with the district court that rebates given to Costco customers at the checkout register must be counted toward the calculation of the net price at which Prestige sold Clear Eyes to Costco. In *Fred Meyer, Inc. v. FTC,* we evaluated a Section 2(a) claim and concluded that a supplier's "[b]uy two cans and get one free" promotion was a "price concession[ ] cognizable under section 2(a)." 359 F.2d 351, 359, 362 (9th Cir. 1966), *rev'd in part on other grounds*, 390 U.S. 341, 88 S.Ct. 904, 19 L.Ed.2d 1222 (1968). The promotion allowed customers of the favored wholesaler to buy three cans for the price of two and the supplier then reimbursed the favored wholesaler for the cost of the third can. *Id.* at 359. The supplier did not offer that promotion to other competitors. *Id.* We concluded that, where a manufacturer's reimbursement "amounts were directly related to and dependent upon the amount of goods purchased and resold by [the favored wholesaler]," they amounted to a "price concession" and thus should be included in the calculation of the favored wholesaler's net price. *Id.* at 362.

Prestige argues that *Fred Meyer* is distinguishable because, in that case, "there was no indication that the *full promotional value* of goods at issue were passed on to the supermarket's customers." In other words, Prestige argues that there, the favored wholesaler in *Fred Meyer* may have given its customers a free third can but then "charged a higher price for the other two, making the value of the 'free' can different than the value that it received from [the supplier]." Thus, Prestige asserts, the favored wholesaler may have operated as an "intermediary" rather than a "redemption agent," which it argues is a significant distinction.

In our view, this distinction is without a difference. At bottom, the rebate at issue here reduced Costco's net price for a box of Clear Eyes. And Costco used that cost reduction to lower the prices of Clear Eyes for its customers to $11.99. A favored purchaser bestowing upon consumers the benefits it receives through a manufacturer's discriminatory pricing is a kind of competitive injury that Section 2(a) addresses. If Costco did not pass along its lower price to customers and instead kept the rebate for itself and sold Clear Eyes for $14.99, then it would be harder to see how Prestige's price discrimination would injure Wholesalers in the competitive sense. But here the injury stems precisely from the fact that customers are more likely to flock to Costco to take advantage of a roughly twenty-percent-off promotion: this benefit is realized by the customers themselves, rather than by Costco.

## IV.

**\*11**   Prestige challenges the district court's decision to grant a permanent injunction. We review a "district court's issuance of a permanent injunction under three standards: 'factual findings for clear error, legal conclusions de novo, and the scope of the injunction for abuse of discretion.' " *Galvez v. Jaddou*, 52 F.4th 821, 829 (9th Cir. 2022) (quoting *United States v. Washington*, 853 F.3d 946, 962 (9th Cir. 2017)).

Section 16 of the Clayton Act provides the following:

> Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws, including sections 13, 14, 18, and 19 of this title, when and under the same

conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity.

15 U.S.C. § 26.

To receive injunctive relief under Section 16, a private plaintiff must show "threatened loss or damage 'of the type the antitrust laws were designed to prevent and that flows from that which makes defendants' acts unlawful.' " *Cargill*, 479 U.S. at 113, 107 S.Ct. 484 (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977)). A plaintiff "need only demonstrate a significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur." *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 130, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969).

Prestige argues that the district court abused its discretion in entering the injunction because Wholesalers failed to establish that they suffered an injury or that the injury is likely to recur. This argument is unavailing because the jury returned a verdict for Wholesalers on their Section 2(a) claims and the district court correctly concluded that Prestige's conduct toward Wholesalers, except for Border Cash & Carry, violated Section 2(d). Prestige's contention that an injunction is unwarranted because Wholesalers have stopped purchasing Clear Eyes is particularly puzzling. At least four of the Wholesalers testified that they stopped purchasing Clear Eyes from Prestige and began purchasing from Costco because of the lower price at Costco that resulted from Prestige's unlawful price discrimination. Thus, Prestige's argument is essentially that it should be free from an injunction because its discrimination was so pronounced that it converted Costco's independent *competitors* into *customers*. We are not persuaded. Issuance of a permanent injunction is an appropriate remedy for Prestige's anticompetitive conduct.

## V.

Wholesalers appeal the district court's award of attorney's fees. The district court calculated attorney's fees using the lodestar method, whereby the court:

> must start by determining how many hours were reasonably expended on the litigation, and then multiply those hours by the prevailing local rate for an attorney of the skill required to perform the litigation. The district court may then adjust upward or downward based on a variety of factors. The number of hours to be compensated is calculated by considering whether, in light of the circumstances, the time could reasonably have been billed to a private client.

*Moreno v. City of Sacramento*, 534 F.3d 1106, 1111 (9th Cir. 2008) (citations omitted).

 **\*12**  We review the district court's award of attorney's fees for an abuse of discretion. *Moskowitz v. Am. Sav. Bank, F.S.B.*, 37 F.4th 538, 542 (9th Cir. 2022).

Wholesalers argue that the district court erred by failing to identify and apply the correct prevailing rate for comparable work in the Central District of California in its lodestar calculation. The hourly rates a district court uses in its fee calculation must be "in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience[,] and reputation." *Blum v. Stenson*, 465 U.S. 886, 895 n.11, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984). In addition, "fee awards must be 'based on current rather than merely historical market conditions,' " and "the adjudicator should rely on[ ] the most current information available." *Seachris v. Brady-Hamilton Stevedore Co.*, 994 F.3d 1066, 1077–78 (9th Cir. 2021) (quoting *Christensen v. Stevedoring Services of Am.*, 557 F.3d 1049, 1055 (9th Cir. 2009)).

Wholesalers requested rates of $1,314 per hour for the named partners of Gaw | Poe, and $1,001 for their three more junior colleagues who worked on the case. They supported these requests with a declaration and analysis from Gerald Knapton, an expert with thirty years of experience calculating attorney's fees and particular expertise regarding antitrust cases. Knapton based his expert opinion in part on the 2023 edition of the Real Rate Report, a Wolters Kluwer publication that compiles rates from actual law firm invoicing for legal work performed from July 2020 through June 2023. Prestige engaged its own expert who agreed that an appropriate prevailing rate for the lodestar analysis would be the rate for third quartile litigators in Los Angeles from the 2023 Real Rate Report.

The district court, however, declined to base its fees calculation on the prevailing market rate—that is, the rate "for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Seachris*, 994 F.3d at 1076 (quoting *Blum*, 465 U.S. at 895 n.11, 104 S.Ct. 1541). Instead, the district court set counsel's rates based on what the attorneys had been awarded for handling a prior contract dispute, with a slight adjustment for the complexity of the case and inflation. In doing so, the district court abused its discretion.

In *Gonzalez v. City of Maywood*, we vacated a fee award where "there [was] no indication that the district court computed Plaintiffs' lodestar figure using the market rate prevailing in the Central District of California for attorneys and paralegals of similar 'experience, skill, and reputation' to members of Plaintiffs' legal team working on similarly complex matters." 729 F.3d 1196, 1206 (9th Cir. 2013). In this case, the district court should have based its lodestar calculation on the prevailing market rate for similar services rather than looking to the rates a court had awarded in a previous contract dispute.

The parties' experts agreed that the prevailing rate for Wholesalers' attorneys in this litigation would be the rate for third quartile litigation partners in Los Angeles drawn from the 2023 Real Rate Report. Wholesalers' attorneys argue that such a rate is more than justified, asserting that their experience with RPA litigation is unrivaled by any firm in the country. Their small firm has litigated at least six RPA cases since 2015. Indeed, they were trial counsel and lead appellate counsel in *U.S. Wholesale*, 89 F.4th. at 1132. They have also ably achieved a favorable outcome in the present litigation.

**\*13**  In response, Prestige contends that the district court did consider the prevailing market rates, as it explicitly referenced the Real Rate Report and concluded that the 2023 rate for Los Angeles-based firms with 50 or fewer lawyers was too low but found that the 2023 rate for large firms was too high. The district court noted that Plaintiffs relied heavily on cases involving fee awards to "big law" firms and found it "unreasonable to award big law rates to a four-person firm representing mom-and-pop warehouses." But district courts may not reduce fee awards based on the size of counsel's firm. As we have held before, the district court is meant to compare *lawyers*, not *firms*:

> the court may permissibly look to the hourly rates charged by comparable attorneys for similar work, but may not attempt to impose its own judgment regarding the best way to operate a law firm, nor to determine if different staffing decisions might have led to different fee requests. The difficulty and skill level of the work performed, and the result achieved—not whether it would have been cheaper to delegate the work to other attorneys—must drive the district court's decision.

*Moreno*, 534 F.3d at 1115.

The Second Circuit has persuasively spoken on the reasons that underlie this rule in *McDonald ex rel. Prendergast v. Pension Plan of the NYSA-ILA Pension Trust Fund*, 450 F.3d 91 (2d Cir. 2006). There, the court reviewed a district court's attorney's fees award, noting that the district court found it "[o]f great significance" that an attorney "was a solo practitioner with lower overhead costs than attorneys associated with large firms." *Id.* at 97 (alteration in original). The Second Circuit found enough

in the record to support the district court's fee award but "caution[ed]" that firm size is not "grounds for an automatic reduction in the reasonable hourly rate," reasoning that:

> Overhead is not a valid reason for why certain attorneys should be awarded a higher or lower hourly rate. Rather, overhead merely helps account for why some attorneys charge more for their services. Indeed, it may be that in certain niche practice areas, attorneys of the highest "skill, expertise, and reputation" have decided to maintain a solo practice instead of affiliating themselves with a firm. The reasons for doing so may be numerous, including the inherent problems of higher overhead, fee-sharing, and imputed conflicts of interest. The focus of the inquiry into the reasonable hourly rate must instead be determined by reference to "prevailing [rates] in the community for similar services by lawyers of reasonably comparable skill, expertise, and reputation."

*Id.* at 97 n.6 (alteration in original) (citations omitted).

We agree. A firm's small size should not automatically result in its attorneys receiving a reduced hourly rate. A firm's size does not directly bear on the factors we must consider when awarding fees—the lawyers' skill, experience, and reputation. *Blum*, 465 U.S. at 895 n.11, 104 S.Ct. 1541. Indeed, some of the most skillful, experienced, and reputable attorneys strike out on their own or with several colleagues. History reminds us that brilliance at the bar is not measured by the number of associates a lawyer commands; Abraham Lincoln, Clarence Darrow, Thurgood Marshall, Ruth Bader Ginsburg, and Gerry Spence are just a few luminaries who perfected their skills and made enduring marks on our profession without joining the ranks of large law firms. We should not reduce fees awards to lawyers simply because of how they have structured their workplaces. And, conversely, the fact that a firm is larger and has a larger overhead should not automatically entitle its attorneys to higher fees. For example, while a larger firm may have higher total overhead expenses, its costs per case may in fact be lower. Indeed, in both economic theory and antitrust doctrine, larger firms are often associated with greater efficiencies. *See e.g.*, Alan A. Fisher & Robert H. Lande, *Efficiency Considerations in Merger Enforcement*, 71 Cal. L. Rev. 1580, 1605 (1983) ("recent studies, both theoretical and empirical, suggest that large firms very often are more efficient than small firms in a given market, so mergers to create market leaders on average may lower costs"). So a law firm's size alone cannot determine its market rate for the purposes of a lodestar calculation.

 **\*14**  With that in mind, the district court abused its discretion when it declined to base its lodestar calculation on the rate in the 2023 Real Rate Report because "it is simply unreasonable to award big law rates to a four-person firm representing mom-and-pop warehouses." First-rate attorneys who prevail in litigation are entitled to receive fees commensurate with their skill, experience, and reputation, even if their clients are mom-and-pop businesses that don't have Fortune 500 budgets to hire big law firms to represent them. We vacate the district court's award of attorney's fees to Wholesalers and remand for the district court to recalculate fees consistent with this opinion.

## VI.

We affirm the district court with respect to the jury instructions, net price calculation, and permanent injunction. We vacate the district court's award of attorney's fees and remand with instructions to enter a new fee award consistent with this opinion.

**AFFIRMED in part; VACATED and REMANDED in part.**

**All Citations**

--- F.4th ----, 2026 WL 504763

## Footnotes

1       For instance, the RPA allows manufacturers to pass on some of their savings from efficiencies in dealing with the large buyer. 15 U.S.C. § 13(a) ("[N]othing herein contained shall prevent differentials which make only due allowance for differences in the cost of manufacture, sale, or delivery resulting from the differing methods or quantities in which such commodities are to such purchasers sold or delivered.").

2       The district court granted Prestige partial summary judgment on the non-California Wholesalers' UPA and UCL claims.

**End of Document**
© 2026 Thomson Reuters. No claim to original U.S. Government Works.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works.